*Tamere Thornton v. State of Maryland*, No. 51, September Term, 2018.  Opinion by Greene, J.

**CRIMINAL JUSTICE — FOURTH AMENDMENT — SEARCH AND SEIZURE — TRAFFIC STOPS — REASONABLE SUSPICION**

The Court of Appeals held that law enforcement officers lacked reasonable suspicion to frisk Petitioner for weapons.  The officers involved testified that they observed Petitioner make furtive gestures while he was sitting in his parked vehicle, which indicated to the officers that Petitioner was armed and dangerous.  According to the two officers, they saw Petitioner "raise his right shoulder and . . . bring his elbows together."  In addition, Petitioner, while sitting in his vehicle and being questioned by the officers, kept his hands in front of his lap, adjusted his waistband, and would "lean over" to address the officers.  The officers' testimony amounted to little more than an inchoate and unparticularized hunch that Petitioner was armed and dangerous.  Under the circumstances, the officers failed to particularize an objectively reasonable basis for believing that Petitioner was armed and dangerous.  Therefore, the frisk of Petitioner was unlawful pursuant to the Fourth Amendment.

**CRIMINAL JUSTICE — FOURTH AMENDMENT — SEARCH AND SEIZURE — ATTENUATION DOCTRINE**

The Court of Appeals held that the attenuation doctrine did not apply to render admissible the fruits of the unlawful frisk.  Mere moments passed between the unlawful frisk and discovery of the handgun.  Petitioner, without legal justification, attempted to flee from the unlawful frisk.  The officers, however, discovered the gun by exploiting the illegal frisk and not by reason of Petitioner's reactive flight.  In addition, the officers' conduct was purposeful and calculated for investigatory purposes unrelated to the stop and was, thus, otherwise flagrant.  Furthermore, the exclusionary rule's deterrent purpose is served by applying the rule to the present case.  Therefore, Petitioner's gun should have been excluded as evidence.

Circuit Court for Baltimore City
Case No. 116027021
Argued: February 5, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 51

September Term, 2018

_____

TAMERE THORNTON

v.

STATE OF MARYLAND

_____

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty
Adkins, Sally D., (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Greene, J.
McDonald and Watts, JJ., dissent.

_____

Filed: August 6, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In the present case, we are asked to review the constitutionality of the means by which police officers discovered a gun in the possession of Petitioner Tamere Thornton ("Petitioner" or "Mr. Thornton"). On the afternoon of January 1, 2016, three police officers were on patrol looking to discover guns, drugs, or other contraband when they observed Petitioner sitting in the driver's seat of a vehicle that was illegally parked outside of Petitioner's home. The officers appoached the parked vehicle and ultimately began to frisk Mr. Thornton, which culminated in Mr. Thornton's arrest after officers confirmed that he possessed a handgun. We hold that the gun should have been excluded as evidence against Petitioner because the State failed to establish that the frisk of Petitioner was reasonable under the circumstances. Moreover, the attenuation doctrine does not serve to render the evidence admissible because the officers discovered the handgun by exploitation of the unlawful frisk, and the officers' misconduct was flagrant.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Thornton was charged and convicted in the Circuit Court for Baltimore City with possession of a firearm after having been convicted of a disqualifying crime.[1] The charge and conviction followed an incident, which culminated in Mr. Thornton's arrest after officers removed a handgun from Mr. Thornton. Mr. Thornton filed a motion to

---

[1] In addition to possessing a firearm after having been convicted of a disqualifying crime, Mr. Thornton was charged with the following crimes: possessing a handgun after being convicted of a crime of violence; wearing, carrying, or transporting a handgun on our about his person; wearing, carrying, or transporting a handgun in a vehicle traveling on a public road; and possessing ammunition after having been prohibited from possessing a regulated firearm.

suppress, seeking to exclude the gun as evidence against him at trial.  On August 29, 2016, the trial court held a suppression hearing on Mr. Thornton's motion.

*The Suppression Hearing*

The State called Officers Kenneth Scott ("Officer Scott") and Jeffrey Zimmerman ("Officer Zimmerman") to testify as witnesses during the suppression hearing.  Mr. Thornton's counsel cross-examined the officers, but Mr. Thornton did not testify or otherwise call any witnesses at the hearing.  To summarize the facts of this case, we look to testimony from both officers.

On January 1, 2016 at approximately 2:00 p.m., Officers Scott and Zimmerman were on patrol in an unmarked police car.  They were accompanied by a third officer, who was identified as Officer Gruver.  The officers were driving on Midwood Avenue, intending to turn left onto McCabe Avenue.  According to Officer Scott, McCabe Avenue is "a high drug area[.]"  The officers were in the area looking for drugs, weapons, and other contraband.

Meanwhile, Mr. Thornton was on the 5200 block of Midwood Avenue, sitting in the driver's seat of a silver Cadillac.  The vehicle's lights and engine were off, and Mr. Thornton was the only occupant.  The vehicle was parked along the curb across the street from Mr. Thornton's home, but it was facing the wrong direction.[2]  As the suppression

---

[2] Unless provided otherwise, "a vehicle that is stopped or parked on a two-way roadway shall be stopped or parked parallel to the right hand curb or edge of the roadway, with its right hand wheels within 12 inches of that curb or edge of the roadway."  Md. Code Ann., Transportation Article, § 21-1004(a).  To violate this parking provision is not an arrestable offense.  *See* Md. Code Ann., Transportation Article, § 27-101(b).  Generally, the violation (continued . . .)

court found, there was construction work being done on the street that interfered with ordinary parking.

Officer Scott noticed the improperly parked vehicle. At Officer Scott's direction, Officer Zimmerman, who was driving the police car, pulled behind Mr. Thornton's vehicle and activated the emergency lights on the police car. The officers intended to inform the vehicle's driver that the car was illegally parked. Officers Scott and Zimmerman exited the police car and approached the parked vehicle. Officer Zimmerman approached on the driver's side, and Officer Scott approached on the passenger's side.

When the officers reached the car, they questioned Mr. Thornton for approximately 30-40 seconds. There is no indication that the officers informed Mr. Thornton that his vehicle was illegally parked. In addition, the officers never issued Mr. Thornton a parking citation. Neither officer could affirm that they investigated the license plate on Mr. Thornton's vehicle or asked Mr. Thornton for his license and registration, although both officers testified that running a vehicle's tags and asking for a driver's license and registration is standard procedure for issuing a parking citation to the operator of an illegally parked vehicle.

By all accounts, Mr. Thornton's demeanor while he was being questioned was "laid back." The suppression court found that there was "no indication of verbal aggressiveness, disobedience, [or] false identification." There was "[n]o evidence of a tip, that something

_____

(. . . continued)
of a minor offense under the Maryland Vehicle Laws is a misdemeanor punishable by "a fine of not more than $500." *Id*.

bad had happened . . . . [T]here was no evidence of a rash of recent crimes that [Mr. Thornton] could be assigned to. No indication that [Mr. Thornton] fit some description of some third party." Nonetheless, both officers testified that Mr. Thornton showed characteristics of an armed individual. According to the trial court's factual findings, to support their notion that Mr. Thornton was armed, "[a]ll [the officers] ha[d] [wa]s . . . conduct with [Mr. Thornton's] hands [that the officers observed] while [Mr. Thornton was] being approached by the police officers."

At the suppression hearing, the officers described the conduct they observed that led them to believe that Mr. Thornton was armed. Even though Mr. Thornton was observed seated in a vehicle, Officer Scott testified that when a person is armed, "they walk . . . with their arm[s] straight, sometimes they don't like swing their arms a lot or they check[] . . . their . . . front waistband area." Officer Scott explained that, as he was approaching Mr. Thornton's car, he saw Mr. Thornton looking out of his mirror. He also saw Mr. Thornton "numerous times like start making movements to his front area[.]" He did not describe the specific movements that he saw. Officer Scott explained that, while Mr. Thornton was being questioned, Mr. Thornton had his hands down by his side near his waist. According to Officer Scott, "[Mr. Thornton] just kept like doing like a check, like just trying to, I don't know, like push it down or . . . I don't know . . . just to make sure it's secured." Mr. Thornton made such movements "[n]umerous, numerous times." Officer Scott inferred that Mr. Thornton was doing "a weapons check . . . like he had something he was trying to hide."

- 4 -

Officer Zimmerman testified that an armed individual may have "a bladed stance away from you, [do] security checks, maybe favor[] one side of [his or her] body but a big one is . . . hold[] the area where the weapon is concealed." Officer Zimmerman indicated that, when seated in a vehicle, the individual may move his or her shoulders "up or down drastically and that would show that [the individual is] maybe trying to reach under [his or her] seat or to, you know, further conceal something in [his or her] front waistband." In addition, Officer Zimmerman noted that the suspect may make "quick movements that are kind of uncharacteristic with just being seated in a vehicle."

Officer Zimmerman testified further that, as he was approaching Mr. Thornton's vehicle, he saw Mr. Thornton "raise his right shoulder and kind of bring his elbows together[.]" Officer Zimmerman said that Mr. Thornton appeared "uncomfortable with whatever was in his lap . . . he kept trying . . . [to] mak[e] adjustments, kept his hands in front of his lap." When speaking with the officers, "Mr. Thornton would lean over to the right to address . . . Officer Scott and then again would sit back down and attempt to adjust something in his waistband." Mr. Thornton appeared to be "manipulating something, that he was obviously uncomfortable with, didn't like the position or . . . the size, the shape, but there was something that he was manipulating." At first, Officer Zimmerman said that Mr. Thornton made such movements two or three times. Later, Officer Zimmerman testified that Mr. Thornton touched his waistband four to five times. Officer Zimmerman conceded that Mr. Thornton may have been moving to address the officers, who were stationed on either side of his vehicle. He also acknowledged that, in his experience, individuals tend to be more nervous around police and may move around as a result. He maintained,

however, that Mr. Thornton was not making nervous movements; his movements were characteristic of an armed person.

Because the officers thought that Mr. Thornton exhibited signs of an armed individual, Officer Scott said that the stop was no longer an ordinary traffic stop. Officer Scott asked Mr. Thornton whether he could search Mr. Thornton's car. Mr. Thornton declined. In response, Officer Scott told Mr. Thornton that they would have to wait for a K-9 unit to arrive. Officer Zimmerman explained that "[s]ometimes we will say that we're calling for a K-9 unit to" scare or "gauge the reaction of the person that [we're] speaking to." There is no indication that Officer Scott's threat to call a K-9 unit invoked any particular reaction from Mr. Thornton. At the suppression hearing, Officer Scott testified that he did not intend to call a K-9 unit to the scene. Officer Scott explained that his true intention was to search Mr. Thornton because he believed Mr. Thornton was armed. On cross-examination, Officer Scott was unable to explain why he would ask to search Mr. Thornton's vehicle and threaten to call a K-9 unit if, all along, he believed that Mr. Thornton had a weapon.

Officer Scott told Officer Zimmerman to pull Mr. Thornton out of the car to check him for weapons. Officer Zimmerman asked Mr. Thornton to step out of the car and "place his hands upon his head so [Officer Zimmerman] could perform [a] pat[-]down[.]" Mr. Thornton complied. Both officers acknowledged that, at this point, Mr. Thornton was not free to leave. Officer Zimmerman initiated the weapons check, and he made contact with Mr. Thornton's waistband. Upon making contact, Officer Zimmerman did not feel a weapon. Once Officer Zimmerman made contact with Mr. Thornton's waist, Mr. Thornton

- 6 -

"pushed [Officer Zimmerman] aside a little bit and then ran." As Mr. Thornton tried to run away, he slipped and fell. Officer Zimmerman jumped on top of Mr. Thornton, and the officers placed him in handcuffs. The officers rolled Mr. Thornton onto his back, exposing a handgun that was lying on the ground beneath Mr. Thornton.

*The Suppression Court's Ruling*

The suppression court engaged in a methodical analysis of the facts, analyzing the timeline of events in chronological order. First, the court analyzed the officers' initial confrontation with Mr. Thornton for the traffic violation. The court found that the traffic stop may have been pretextual, *i.e.*, "just an excuse to inquire further into the driver[.]" Even so, citing to *Whren v. United States*,[3] the court concluded that there was "in fact a real violation" because Mr. Thornton's car was parked illegally.[4] Therefore, the court concluded that the initial stop was lawful.

---

[3] 517 U.S. 806, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996).

[4] "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L.Ed.2d 89 (1996) (citations omitted). In *Whren v. United States*, the United States Supreme Court held that a law enforcement officer's "[s]ubjective intentions play no role" in analyzing the constitutional reasonableness of a traffic stop. *Id.* at 813, 116 S. Ct. at 1774. There are, of course, limitations to the holding in *Whren*, which permits officers to conduct traffic stops regardless of their personal motivation for stopping the vehicle. *See, e.g.*, *Ferris v. State*, 355 Md. 356, 372, 735 A.2d 491, 499 (1999) (holding that questioning an occupant of a car about possible criminal activity after completing a traffic stop constituted a second detention that was not supported by reasonable suspicion); *Charity v. State*, 132 Md. App. 598, 629, 753 A.2d 556, 573 (2000) (holding that a detention for purposes of engaging in a narcotics-related investigation went beyond the permissible scope of a *Whren* traffic stop).

Next, the court reviewed whether the officers were justified in searching Mr. Thornton's person, based on the movements or "furtive gestures"[5] that they saw Mr. Thornton make. Looking to Officer Scott's testimony first, the court explained that "[h]e g[ave] very few details about what [Mr. Thornton's] conduct consist[ed] of[.]" Furthermore, the court found that Officer Scott asking to search Mr. Thornton's car and threatening to call a K-9 unit was "somewhat inconsistent with his genuine belief that there might be a weapon involved." The court concluded that his testimony was "unconvincing" and "d[id] not convince nor d[id] it establish sufficient cause for a search[.]"

On the other hand, the suppression court explained that Officer Zimmerman provided "much greater detail as to what the specific motions were that constituted proof or suggestion that [Mr. Thornton] was possibly armed[.]" The court recounted that Officer Zimmerman demonstrated, in court, the movements that he observed of Mr. Thornton. The court found that if Mr. Thornton moved as described, such movements "could be consistent with adjusting the position of a gun in the waistband or in some other actions toward the [waist]band." Citing *In re Jeremy P.*,[6] however, the court explained that "a security check by itself . . . is not enough to establish either reasonable [suspicion] or probable cause because it could represent any variety of behaviors other than checking on a gun." The

---

[5] Furtive gestures have been likened to movements that are evasive, "such as attempts to reach for a concealed weapon." *Sellman v. State*, 449 Md. 526, 550, 144 A.3d 771, 786 (2016). Black's Law Dictionary defines furtive gesture as "[a] surreptitious movement, esp[ecially] one seeming to be hiding something, seen by a police officer and providing reasonable suspicion to detain or search." Furtive Gesture, *Black's Law Dictionary* (10th ed. 2014).

[6] 197 Md. App. 1, 11 A.3d 830 (2011).

record lacked any indication of verbal aggression, disobedience, or false identification on Mr. Thornton's part, or evidence of a tip or crime to which Mr. Thornton could be connected. The court noted that the officers' sole basis for justifying the search was the movements that they observed Mr. Thornton making as he was sitting in his vehicle.

Relying on *Pennsylvania v. Mimms*,[7] the court explained that police officers may lawfully order an operator out of the vehicle during the course of a traffic stop. Therefore, the suppression court determined that the officers lawfully asked Mr. Thornton to exit the vehicle. The court, however, found that the officers had "very questionable reasonabl[e] articulable suspicion" to subsequently frisk Mr. Thornton. The court explained that, at this point, "had they done a frisk of [Mr. Thornton] . . . there would be serious question as to the legality of the frisk." According to the suppression court, however, "the search had not really begun as of the time when [Mr. Thornton] turned and ran[.]"

Finally, assuming *arguendo* that an unlawful search had occurred, the court considered whether the attenuation doctrine rendered the handgun admissible. The court found that Mr. Thornton's flight constituted an intervening circumstance that "attenuate[d] the initial illegality." Therefore, the court denied Mr. Thornton's motion to suppress.

*Conviction and Sentencing*

Following the suppression court's ruling, Mr. Thornton entered a plea of not guilty and proceeded on an agreed upon statement of facts. The trial court found the State's factual proffer, which included admitting evidence of the gun recovered from the ground,

---

[7] 434 U.S. 106, 98 S. Ct. 330, 54 L.Ed.2d 331 (1977).

sufficient to support a criminal conviction. Consequently, the court convicted Mr. Thornton of one count of possessing a regulated firearm after having been convicted of a crime of violence.[8] He was sentenced to four years of incarceration with the possibility of parole.

*The Court of Special Appeals*

Mr. Thornton noted an appeal to the Court of Special Appeals. Before our intermediate appellate court, Mr. Thornton challenged the suppression court's ruling on his motion to suppress. *Thornton v. State*, 238 Md. App. 87, 106, 189 A.3d 769, 780 (2018). In its analysis, the court reviewed the constitutionality of the frisk of Mr. Thornton's person. *Id*. at 122, 189 A.3d at 789. The court found no caselaw "holding that testimony about a movement by the occupant of a vehicle while an officer is approaching is enough to generate reasonable suspicion that the occupant is armed and dangerous." *Id*. Notably, the court declined to reach an ultimate conclusion as to the constitutionality of the frisk. *Id*. at 123, 238 A.3d at 790. Instead, the court assumed for purposes of its analysis that the officers lacked the requisite quantum of suspicion to justify the pat-down. *Id*.

Next, assuming that the frisk was unlawful, the court reviewed whether the handgun was admissible under the attenuation doctrine. *Id*. at 124-37, 189 A.3d at 790-98. The court explained that there was only a brief time lapse between the officers' discovery of the handgun and the pat-down of Mr. Thornton. *Id*. at 126, 189 A.3d at 792. Next, the

---

[8] "Mr. Thornton was found to be prohibited from possessing a firearm due to a February 27, 2008 murder in the second degree." The court did not rule on Mr. Thornton's guilt or innocence with regard to the remaining charges.

- 10 -

court determined that Mr. Thornton's flight could be a crime in itself pursuant to Md. Code Ann., Transportation Article, § 21-904(b)(2).[9] *Id.* at 131, 189 A.3d at 794. His conduct, according to the Court of Special Appeals, gave the officers probable cause to believe that Mr. Thornton was violating the Transportation Article, thereby providing them with probable cause to arrest Mr. Thornton. *Id.* at 131, 189 A.3d at 794-95. Accordingly, the court concluded that the officers conducted a lawful seizure of Mr. Thornton through which they discovered the handgun. *Id.* at 135, 189 A.3d at 797. Finally, the court explained that any misconduct committed by the officers was not flagrant. *Id.* at 137, 189 A.3d at 798. Thus, weighing the aforementioned factors, the Court of Special Appeals determined that the discovery of the handgun was sufficiently attenuated from the unlawful frisk, so the handgun should not be suppressed as evidence. *Id.*

Mr. Thornton petitioned this Court for a writ of certiorari, which we granted. We now review whether the suppression court properly denied Mr. Thornton's motion to suppress the gun as evidence.[10]

---

[9] "If a police officer gives a visual or audible signal to stop and the police officer is in uniform, prominently displaying the police officer's badge or other insignia of office, a driver of a vehicle may not attempt to elude the police by . . . [f]leeing on foot[.]" Md. Code Ann., Transportation Article, § 21-904(b)(2).

[10] The questions presented, as articulated by Petitioner, are:
1. Did the circuit court properly deny the motion to suppress on the grounds that Petitioner's attempted flight from a pat-down, which the motions judge believed was based on "very questionabl[e] reasonable suspicion,' attenuated the link between any unlawful police conduct and the discovery of a firearm on Petitioner's person?
   a. Where police witnesses, the prosecutor below, and the State on appeal never suggested that Petitioner's attempted flight constituted a new crime, did the
(continued . . .)

**STANDARD OF REVIEW**

"When reviewing a hearing judge's ruling on a motion to suppress evidence under the Fourth Amendment, we consider only the facts generated by the record of the suppression hearing." *Sizer v. State*, 456 Md. 350, 362, 174 A.3d 326, 333 (2017) (citation omitted). We review the evidence and the inferences drawn therefrom in the light most favorable to the prevailing party. *Id.*

Suppression rulings present a mixed question of law and fact. *Swift v. State*, 393 Md. 139, 154, 899 A.2d 867, 876 (2006) (citations omitted). We recognize that the "[hearing] court is in the best position to resolve questions of fact and to evaluate the credibility of witnesses." *Id.* Accordingly, we defer to the hearing court's findings of fact unless they are clearly erroneous. *Bailey v. State*, 412 Md. 349, 362, 987 A.2d 72, 80 (2010). We do not defer to the hearing court's conclusions of law. *Id.* "[W]e review the hearing judge's legal conclusions *de novo*, making our own independent constitutional

---

(. . . continued)

      Court of Special Appeals err in concluding, post-hoc, that the flight established probable cause to arrest Petitioner for fleeing and eluding under the Transportation Article?

b. If Petitioner's attempted flight did not provide probable cause to arrest him for the offense of fleeing and eluding, to what extent, if any, may flight in and of itself constitute an intervening circumstance for purposes of the attenuation doctrine?

c. Assuming, *arguendo*, that Petitioner's attempted flight, which was prompted by the illegal frisk, did establish probable cause to arrest him for fleeing and eluding, does the commission of any new crime attenuate the taint from an unlawful search or seizure, or only the commission of certain crimes?

d. Did the Court of Special Appeals misapply the third factor of the attenuation doctrine (*i.e.*, the purpose and flagrancy of the police misconduct)?

- 12 -

evaluation as to whether the officer's encounter with the defendant was lawful." *Sizer*, 456 Md. at 362, 174 A.3d at 333 (citation omitted).

## DISCUSSION

The Fourth Amendment to the United States Constitution guarantees, in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. The Amendment's protections are made applicable to the States through the Fourteenth Amendment. *Grant v. State*, 449 Md. 1, 16, 141 A.3d 138, 146 (2016) (citations omitted). When evidence is obtained in violation of the Fourth Amendment, it will ordinarily be inadmissible in a state criminal prosecution pursuant to the exclusionary rule. *Bailey*, 412 Md. at 363, 987 A.2d at 80. In certain instances, however, an exception to the exclusionary rule may permit the admission of the evidence that was obtained in violation of the Fourth Amendment. *See, e.g.*, *Sizer*, 456 Md. at 364, 174 A.3d at 334.

### 1. Whether Petitioner's Fourth Amendment Rights Were Violated

In the present case, the parties seemingly assume, without arguing, that the officers conducted an unlawful frisk of Petitioner. As such, the parties proceed to debate whether excluding the handgun as evidence was an appropriate consequence. At most, the State urges that this Court should not decide whether the officers had reasonable suspicion to frisk Petitioner.[11] Similarly, neither the suppression court nor the Court of Special Appeals

---

[11] The State contends that we should remand the case to the suppression court for the court to opine on whether the frisk was supported by reasonable articulable suspicion. We have before us, however, an ample hearing record and sufficient findings of fact by the (continued . . .)

- 13 -

explicitly opined on whether the officers violated Petitioner's Fourth Amendment rights. The suppression court determined that the officers had "very questionable reasonabl[e] articulable suspicion[.]" The Court of Special Appeals assumed, without deciding, that the officers' frisk of Petitioner was unlawful. *Thornton*, 238 Md. App. at 123, 189 A.3d at 790. We will not bypass this prefatory Fourth Amendment issue. To provide guidance to suppression courts, we begin by deciding whether the frisk violated Petitioner's Fourth Amendment rights.

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. amend. IV. Fourth Amendment jurisprudence has made it clear that warrantless searches and seizures are presumptively unreasonable and, thus, violative of the Fourth Amendment. *Grant*, 449 Md. at 16-17, 141 A.3d at 146-47 (citing *Katz v. United States*, 389 U.S. 347, 356-57, 88 S. Ct. 507, 514-16, 19 L.Ed.2d 576 (1967)). When a police officer conducts a warrantless search or seizure, the State bears the burden of overcoming the presumption of unreasonableness. *Id*. at 17, 141 A.3d at 147. There are "a few specifically established and well-delineated exceptions" to the warrant requirement.[12] *Id*. at 16-17, 141 A.3d at 147-48. One such exception is the "stop and frisk"

(. . . continued)

suppression court to reach the legal conclusion of whether there existed reasonable suspicion to frisk Petitioner. *See Holt v. State*, 435 Md. 443, 458, 78 A.3d 415, 423 (2013) (explaining that "we . . . owe the [suppression] court's legal determination no deference; rather, we must perform our own appraisal of whether there existed reasonable suspicion[.]").

[12] Notable exceptions to the warrant requirement include:
       1) search incident to an arrest (*Arizona v. Gant*, 556 U.S. 332,
(continued . . .)

doctrine, which was recognized by the United States Supreme Court in *Terry v. Ohio*, 392

U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968).

A "frisk" is, in essence, a limited search, which is constrained "to a pat-down of [an

individual's] outer clothing[.]" *Bailey*, 412 Md. at 368, 987 A.2d at 84 (citations omitted).

"The purpose of a protective *Terry* frisk is not to discover evidence, but rather to protect

the police officer and bystanders from harm." *Id.* at 366-67, 412 Md. at 82-83 (citations

and quotations omitted). As such, a law enforcement officer may legitimately frisk an

individual if the officer has reasonable articulable suspicion that the person with whom the

officer is dealing is armed and dangerous.[13] *Id.* at 367, 987 A.2d at 83 (citations omitted).

_____

(. . . continued)
        129 S. Ct. 1710, 173 L.Ed.2d 485 (2009));
        2) hot pursuit (*Warden v. Hayden*, 387 U.S. 294, 87 S. Ct.
        1642, 18 L.Ed.2d 782 (1967));
        3) the plain view doctrine (*Horton v. California*, 496 U.S. 128,
        110 S. Ct. 2301, 110 L.Ed.2d 112 (1990));
        4) the *Carroll* doctrine (*Carroll v. United States*, 267 U.S. 132,
        45 S. Ct. 280, 69 L.Ed. 543 (1925));
        5) stop and frisk (*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20
        L.Ed.2d 889 (1968));
        6) consent (*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct.
        2041, 36 L.Ed.2d 854 (1973)); and
        7) exigent circumstances (*Kentucky v. King*, 563 U.S. 452, 131
        S. Ct. 1849, 179 L.Ed.2d 865 (2011)).
*Grant v. State*, 449 Md. 1, 16 n.3, 141 A.3d 138, 147 n.3 (2016).

[13] To conduct a lawful frisk of an individual, a law enforcement officer must be rightly in
the presence of the individual to be frisked. *See Gibbs v. State*, 18 Md. App. 230, 238-39,
306 A.2d 587, 592 (1973). As such, it has been recognized that "a reasonable 'stop' is a
necessary predecessor to a reasonable 'frisk,' [but] a reasonable 'frisk' does not inevitably
follow in the wake of every reasonable 'stop.'" *Id.* (footnote omitted).

A traffic stop is, indeed, a "detention which implicates the Fourth Amendment."
(continued . . .)

The frisk must be justified by particularized suspicion at its inception. *Id*. Reasonable suspicion does not require an officer to be absolutely certain that an individual is armed and dangerous. *Sellman v. State*, 449 Md. 526, 541, 144 A.3d 771, 780 (2016). It does, however, require an officer to have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Id*. at 542, 144 A.3d at 781 (citation omitted). When a court is faced with deciding whether an officer possessed reasonable suspicion to frisk an individual, the court must take an objective view of the totality of the circumstances. *See Bailey*, 412 Md. at 365, 987 A.2d at 82. The court must decide whether, under the circumstances, "a reasonably prudent [law enforcement officer] . . . would have felt that he [or she] was in danger, based on reasonable inferences from particularized facts in light of the officer's experience." *Id*. at 367, 987 A.2d at 83 (citation omitted). It is a fact-specific inquiry, which the court must view "through the eyes of a reasonably prudent police officer." *Sellman*, 449 Md. at 542, 144 A.3d at 781 (citation and internal quotations omitted). The court should give due weight

(. . . continued)
*Ferris v. State*, 355 Md. 356, 369, 735 A.2d 491, 497 (1999) (citation omitted). Such a detention "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 819, 116 S. Ct. 1769, 1772, 1777, 135 L.Ed.2d 89 (1996) (citations omitted). *Whren* and its progeny, however, are not material to our disposition of the present case. Here, the parties, suppression court, and Court of Special Appeals have not questioned the lawfulness of the *stop* of Mr. Thornton. Their respective analyses hinge entirely upon the premise that the *frisk* of Mr. Thornton was unlawful. As such, we do not opine on whether the stop of Mr. Thornton was constitutional. We limit our analysis to considering whether the officers, having already confronted Mr. Thornton, had reasonable suspicion to believe that Mr. Thornton was armed and dangerous, such that searching him was reasonable under the circumstances.

- 16 -

to an officer's "specific reasonable inferences which he [or she] is entitled to draw from the facts in light of his [or her] experience." *Id*. at 541, 144 A.3d at 780 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883, 20 L.Ed.2d (1986)). The court should give no weight to an officer's "inchoate and unparticularized suspicion or 'hunch.'" *Id*.

This Court has concluded that furtive movements, coupled with additional circumstances, can provide law enforcement with reasonable suspicion to believe that an individual is armed and dangerous. *Chase v. State*, 449 Md. 283, 307-08, 144 A.3d 630, 644 (2016). In *Chase*, two officers were patrolling a hotel parking lot, located in an area known for illicit narcotic activity. *Id*. at 289, 144 A.3d at 634. The officers observed the passenger of a Lexus exit his vehicle and get into the passenger's seat of a Jeep Grand Cherokee. *Id*. at 290, 144 A.3d at 634. The officers observed the occupants make furtive movements. *Id*. at 291-92, 144 A.3d at 635. Specifically, the occupants of the Jeep were moving around, and they put their hands in their pockets. *Id*. at 292, 144 A.3d at 635. The occupants also provided the officers with conflicting explanations for their presence in the parking lot, and the passenger was described as "irate." *Id*. at 292, 144 A.3d at 635-36. Based on the circumstances, the officers suspected that the occupants were involved in illegal activity and may possess weapons. *Id*. at 290-91, 144 A.3d at 634-35.

The officers approached the vehicle and conducted a frisk of the passenger but discovered nothing. *Id*. at 312, 144 A.3d at 647. The officers detained the occupants in handcuffs and dispatched a K-9 unit to the scene. *Id*. at 292-93, 144 A.3d at 635. Ultimately, the officers searched the Jeep and discovered a motel key. *Id.* at 294, 144 A.3d at 636-37. After obtaining a search warrant, the officers found narcotics paraphernalia in

the room associated with the motel key, which, before this Court, was alleged to have been discovered in violation of the driver's Fourth Amendment rights. *Id*. at 294, 144 A.3d at 637. We explained that the officers observed conduct that was "consistent with the hiding of illegal drugs [and] . . . suggested [that] weapons could have been secreted in the vehicle." *Id*. at 307-08, 144 A.3d at 644. Thus, we concluded that the occupants' "actions, mannerisms and 'furtive' movements" gave the officers reasonable suspicion to believe that weapons may have been present. *Id*. at 312, 144 A.3d at 647.

The Court of Special Appeals has concluded that a suspect's furtive movements in a high crime area, alone, were not sufficient to generate reasonable suspicion, where there was no particularized explanation for why the movements were inconsistent with innocent conduct. *In re Jeremy P.*, 197 Md. App. 1, 20-22, 11 A.3d 830, 842-43 (2011). In *In re Jeremy P.*, a detective conducted a stop and frisk of a juvenile who made furtive movements in a high crime area, leading the officer to suspect that he was concealing a handgun. *Id*. at 3-8, 11 A.3d at 832-35. Specifically, the juvenile "kept playing around with his waistband area . . . . And he kept making firm movements in his waistband area." *Id*. at 4, 11 A.3d at 832. The officer observed the furtive movements two or three times. *Id*. at 5, 11 A.3d at 833. He deemed the juvenile's movements as "indicative of somebody constantly carrying a weapon on them." *Id.* The detective asked the juvenile to sit on the ground. *Id*. at 6, 11 A.3d at 833. Ultimately, the detective decided to conduct a pat-down. *Id.* When the officer asked the juvenile to stand up, the detective saw that the juvenile was sitting on top of a gun. *Id*. at 6, 11 A.3d at 834. The detective proceeded with the pat-down and recovered bullets from the juvenile's pants pocket. *Id*. at 7, 11 A.3d at 834.

The Court of Special Appeals explained that "there is no Maryland precedent involving a stop premised solely on the type of waistband adjustments at issue in the case." *Id*. at 13, 11 A.3d at 838. Aside from the waistband adjustments, the juvenile was not claimed to have been behaving in a suspicious manner. *Id*. at 20, 11 A.3d at 842. The detective did not "observe[] a bulge consistent with the presence of a weapon[,]" or "explain why he interpreted [the juvenile's] conduct to indicate the presence of a weapon, rather than merely a cell phone or another innocent object." *Id.* (footnote omitted). In addition, the detective "did not testify about his own experience in recovering a gun based on observations of similar waistband adjustments." *Id*. at 21, 11 A.3d at 842. The Court of Special Appeals refused to "'rubber stamp' conduct simply because the officer believed he had the right to engage in it." *Id.* at 22, 11 A.3d at 843 (quoting *Ransome v. State*, 373 Md. 99, 111, 816 A.2d 901, 908 (2003)). Therefore, the court held that the detective lacked reasonable articulable suspicion to stop the juvenile. *Id*.

Turning to the matter *sub judice*, the State failed to present sufficient evidence to rebut the presumption that the warrantless frisk of Petitioner was unreasonable.[14] *See Grant*, 449 Md. at 11, 141 A.3d at 143 ("[T]he burden . . . is on the State to show that the [officer's warrantless conduct] was reasonable and justified under the [F]ourth

---

[14] The suppression court determined that no frisk occurred because "the search had not really begun as of the time when [Mr. Thornton] turned and ran." The court's conclusion, however, is not supported by the record. Officer Zimmerman testified that he began to pat Mr. Thornton down. Specifically, Officer Zimmerman testified that "[a]s soon as [he] touched Mr. Thorton, [Mr. Thornton] began to run . . . ." Therefore, in our view, although the frisk may not have been completed, it had begun. *Bailey v. State*, 412 Md. 349, 368, 987 A.2d 72, 84 (2010) (defining a "frisk" as a "pat-down of [an individual's] outer clothing[.]").

- 19 -

[A]mendment[.]"). To justify the lawfulness of the frisk, the officers testified that Petitioner made allegedly "furtive" movements while he was seated in his vehicle, which gave them reason to suspect that Petitioner was armed and dangerous. At the time, Mr. Thornton's vehicle was parked across the street from his home, which, according to the officers' testimony, was in a high crime area. According to Officer Zimmerman, whose description of Petitioner's movements was deemed more credible and specific than that of Officer Scott, Petitioner "raise[d] his right shoulder and kind of br[ought] his elbows together[.]" Petitioner, while being questioned, kept his hands in front of his lap, adjusted his waistband, and "would lean over to the right to address . . . Officer Scott and then again would sit back down and attempt to adjust something in his waistband."

In our view, the officers' testimony failed to set forth particularized facts that would warrant an objective officer to believe that he or she was in danger. We note that the purpose of a frisk is "not to discover evidence of a crime, but rather to protect the police officer and bystanders from harm by checking for weapons[.]" *Sellman*, 449 Md. at 543, 144 A.3d at 782 (quoting *Bailey*, 412 Md. at 368, 987 A.2d at 84). During their encounter with Petitioner, the officers outnumbered him three to one. Both Officer Scott and Officer Zimmerman described Petitioner's demeanor as "laid back." We point out that when the police officers approached the vehicle and Petitioner was in the driver's seat, the officers knew or should have known that the misdemeanor prompting them to confront Petitioner was merely a non-arrestable traffic offense. In addition, the suppression court took note of the many circumstances that were *not* presented on the record. The suppression court explained:

> I would note that there's no indication [that Petitioner engaged in] verbal aggressiveness, disobedience, [or] false identification. In fact there's no evidence that any identification was asked for or received. No evidence [that the officers received] a tip, that something bad had happened. Although it was indicated it was a high crime area, there was no evidence of a rash of recent crimes that [Petitioner] could be assigned to. No indication that [Petitioner] fit some description of some third party.

Not unlike in *In re Jeremy P.*, in this case, the suppression court found that the "conduct with [Petitioner's] hands while [Petitioner's vehicle] was being approached by the police officers" was the sole basis for the officers' suspicion that Petitioner was armed and dangerous. 197 Md. App. at 20-22, 11 A.3d at 842-43 (holding that a suspect's furtive movements while in a high crime area, alone, were not sufficient to generate reasonable suspicion).

We recognize that Officer Scott had worked for the Baltimore City Police Department for 10 years, and Officer Zimmerman had worked there for three and a half years. In addition, both officers had training and experience in identifying armed individuals, which their testimony indicated that they drew upon in suspecting that Petitioner's movements were indicative of an armed individual. We give due weight to "the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his [or her] experience." *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L.Ed.2d. 889. Nevertheless, we do not give weight to an officer's "inchoate and unparticularized suspicion or 'hunch.'" *Sellman*, 449 Md. at 541, 144 A.3d at 780 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1986)). To articulate reasonable suspicion, an "officer must explain how the observed conduct, when viewed in the context of all the other circumstances known to the officer, was indicative of criminal activity." *Sizer*, 456

Md. at 365, 174 A.3d at 334 (citation and internal quotations omitted). "[I]t is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Sellman*, 449 Md. at 549, 144 A.3d at 785 (citation omitted). Law enforcement officers cannot "simply assert that innocent conduct was suspicious to him or her." *Chase*, 449 Md. at 298, 144 A.3d at 639 (citation and internal quotations omitted). We repeat what has been said before, this Court will not "rubber stamp conduct simply because the officer believed he had the right to engage in it." *Jeremy P.*, 197 Md. App. at 22, 11 A.3d at 843 (quoting *Ransome v. State*, 373 Md. 99, 111, 816 A.2d 901, 908 (2003)).

Officer Zimmerman explained common characteristics of armed individuals in general. He said that, while seated in a vehicle, armed individuals may drastically move their shoulders, which would indicate that the individual[s] [are] "trying to reach under [their] seat or . . . conceal something in [their] front waistband." He testified that armed individuals make "quick movements that are . . . uncharacteristic with just being seated in a vehicle." The officers did not testify to having observed Petitioner reach under his seat or make any of the quick movements described above. Officer Zimmerman saw Petitioner "raise his right shoulder and kind of bring his elbows together[.]" Nonetheless, the fact that Officer Zimmerman was trained to believe that armed individuals may move "a shoulder . . . up or down drastically," and that he saw Petitioner move his right shoulder is not, by itself, dispositive to our reasonable suspicion analysis. Rather, it is but one factor

to be considered among the totality of the circumstances.[15]   To hold otherwise would effectively allow law enforcement's narrowly drawn authority to conduct a limited frisk for weapons to swallow the general rule that warrantless searches are presumptively unreasonable.

Moreover, the officers failed to articulate an objective basis or provide a justification for suspecting that Petitioner was manipulating or adjusting a *weapon* in his waist area rather than some innocent object.  In fact, Officer Zimmerman conceded that Petitioner's movements may have been consistent with innocent conduct.  For instance, Officer Zimmerman acknowledged that Petitioner's shifting around during the traffic stop could have been attributable to the fact that there were officers on either side of his vehicle, and he was shifting to answer the officers' questions, rather than adjusting a weapon in his waistband or performing a weapons check.  Consequently, the officers failed to explain "why [they] interpreted [Petitioner's] conduct to indicate the presence of a weapon, rather than merely [possession of] a cell phone or another innocent object." *In re Jeremy P.*, 197 Md. App. at 20, 11 A.3d at 842.  The officers' testimony was "not particularized and could

---

[15] Similarly, this Court has iterated that an "officer['s] training and experience that persons involved with drug trafficking carry weapons would not normally, alone, provide the necessary reasonable suspicion to support an investigatory frisk[.]" *Chase v. State*, 449 Md. 283, 303, 144 A.3d 630, 642 (2016) (citing *Dashiell v. State*, 374 Md. 85, 97, 821 A.2d 372, 379 (2003)).  In *Dashiell*, we cautioned:
> While this may be a factor in a totality determination of whether the officers possessed the requisite reasonable suspicion to fear for their safety, this, merely coupled with evidence of drug trafficking, normally will not be the determinative factor.  Generally, this factor by itself would amount to nothing more than a "hunch" as described in *Terry*.

*Dashiell*, 374 Md. at 101 n.4, 821 A.2d at 381-82 n.4.

fit a very large category of presumably innocent travelers, who would be subject to virtually random [searches and] seizures were th[is] Court to conclude that as little foundation as there was in this case could justify a" frisk. *See Sellman v. State*, 449 Md. at 554, 144 A.3d at 788 (2016) (citation and internal quotations omitted). As such, we cannot say that the frisk was based on anything more than an inchoate and unparticularized hunch that Petitioner possessed a weapon.

Viewing the totality of the circumstances, we conclude that the officers did not have reasonable suspicion to lawfully frisk Petitioner. Petitioner was investigated concerning a minor traffic violation, and the officers outnumbered him three to one. Although Petitioner made allegedly "furtive movements" as the officers approached his vehicle, during the encounter, Petitioner was described as "laid back," and he complied with the officers' requests. Under these circumstances, the officers failed to particularize an objectively reasonable basis for believing that Petitioner was armed and dangerous. Indeed, the suppression court found that, during the exchange, the officers acted in a manner that was largely inconsistent with a genuine belief that Mr. Thornton was armed and dangerous. Accordingly, the frisk of Petitioner was based on an inchoate and unparticularized hunch that Petitioner possessed a weapon. The frisk was, therefore, not supported by the requisite quantum of suspicion to overcome the State's burden of proving that the warrantless search was reasonable. We hold that the frisk violated Petitioner's Fourth Amendment rights.

Although Officer Zimmerman lacked reasonable suspicion to believe that Mr. Thornton was armed and dangerous, our analysis does not end there. We must next

determine whether the gun obtained as fruit of the unlawful frisk should be suppressed as evidence pursuant to the exclusionary rule.

## 2. Whether the Fruit of the Unlawful Frisk Should be Suppressed

The exclusionary rule is the "principal judicial remedy" used to deter government actors from committing Fourth Amendment violations. *Utah v. Streiff,* 136 S. Ct. 2056, 2061, 195 L.Ed.2d 400 (2016) (citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691-92, 6 L.Ed.2d 1081 (1961)). Pursuant to the exclusionary rule, when evidence is obtained in violation of an individual's Fourth Amendment right, ordinarily it will be inadmissible in a state criminal prosecution. *Bailey*, 412 Md. at 363, 987 A.2d at 80. Its application prohibits the admission of evidence found as a direct result of unconstitutional conduct in addition to what is known as "fruit of the poisonous tree," meaning any evidence "discovered and found to be derivative of an illegality[.]" *Streiff,* 136 S. Ct. at 2058, 195 L.Ed.2d 400 (citation omitted). "[T]he significant costs of this rule have led [the United States Supreme Court] to deem it 'applicable only . . . where its deterrence benefits outweigh its substantial social costs.'" *Id.* at 2061 (citation omitted). Suppression is, therefore, "our last resort, not our first impulse." *Id*.

There are, of course, exceptions to the exclusionary rule.[16] One such exception is the attenuation doctrine. "The attenuation doctrine evaluates the causal link between the

---

[16] Some notable exceptions to the exclusionary rule include:
  1) independent source doctrine (*Murray v. United States*, 487 U.S. 533, 108 S. Ct. 2529, 101 L.Ed.2d 472 (1988)),
  2) inevitable discovery doctrine (*Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L.Ed.2d 377 (1984));
(continued . . .)

government's unlawful act and the discovery of evidence[.]" *Id.* The doctrine provides an exception to the exclusionary rule when "the connection between [the] unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S. Ct. 2159, 2165, 165 L.Ed.2d 56 (2006)).

When a court is tasked with considering application of the attenuation doctrine, the reviewing court must analyze "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L.Ed.2d 441 (1963) (citation omitted). In *Brown v. Illinois*, the United States Supreme Court articulated three factors that courts should weigh when determining whether the attenuation doctrine applies. 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975). These factors are: (1) the "temporal proximity" between the unlawful conduct and the discovery of the evidence, (2) the "presence of intervening circumstances," and, (3) "particularly, the purpose and flagrancy of the official misconduct." *Id.* Proper application of the *Brown* factors requires balancing each consideration, as "no single factor is dispositive on the issue

---

(. . . continued)
  3) attenuation doctrine (*Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L.Ed.2d 441 (1963)).

of attenuation." *Cox v. State*, 421 Md. 630, 653, 28 A.3d 687, 700 (2011) (citations omitted).

In *Holt v. State*, this Court was asked to decide whether, in applying the attenuation doctrine, a defendant's commission of a new crime may constitute an intervening circumstance that, alone, purges the taint of a Fourth Amendment violation. 435 Md. 443, 457, 78 A.3d 415, 422-23 (2013). A majority of this Court, however, concluded that the law enforcement officers involved had reasonable suspicion to conduct a *Terry* stop of the defendant, and, thus, the defendant's Fourth Amendment rights were not violated. *Id.* at 467-68, 78 A.3d at 429. As such, a majority of this Court did not reach the issue of the attenuation doctrine. *Id*. at 457, 78 A.3d at 423.

Given that, in the present case, we have determined that the officers lacked reasonable suspicion to frisk Petitioner, we must pick up where *Holt* left off. Similarly, in *Holt*, the dissenting opinion concluded that the officers involved lacked reasonable suspicion to stop the suspect. *Id*. at 468, 78 A.3d at 429 (Greene, J., dissenting). Therefore, the dissent addressed the issue of whether a suspect's commission of a new crime would constitute an intervening circumstance that, alone, purged the taint of a Fourth Amendment violation. *Id*. at 468-71, 78 A.3d at 429-31. The dissent rejected the supposition that "a[ny] new [and distinct] crime, even if causally linked to illegal activity on behalf of law enforcement, is an intervening circumstance that attenuates the taint from that illegal activity[.]" *Id*. at 470-71, 78 A.3d at 431.

The dissent asserted that such a holding would effectively eliminate the application of the *Brown* factors. *Id*. at 471, 78 A.3d at 431. In particular, it would eradicate the

application of the third *Brown* factor, which focuses on the flagrancy and purposefulness of governmental conduct. *Id.* Critically, the third *Brown* factor "cuts to the heart of the purpose behind the exclusionary rule: to provide[] an incentive for police to engage in lawful conduct." *Id.* (quoting *Cox*, 412 Md. at 655, 28 A.3d at 701-02) (internal quotations omitted). "To ignore the third attenuation factor, then, would be to ignore the very purpose underlying the exclusionary rule, and would make the protections afforded to defendants by the Fourth Amendment obsolete." *Id.*

In the present case, we decline to undermine or obscure the *Brown* factors in a manner that would offend the exclusionary rule's deterrent purpose. We hold that, where an individual attempts to flee from an unlawful *Terry* frisk, whether the individual's act purges the taint of the Fourth Amendment violation must be analyzed on a case-by-case basis by balancing the factors set forth in *Brown*. *See id.* To hold otherwise would effectively create a bright line rule that would contravene *Brown*, and it would allow flagrant and purposeful police misconduct to go unchallenged. *See id.* Undoubtedly, there will be scenarios where an individual, subsequent to an unlawful police action, commits a new, distinct crime, and his or her actions purge the taint of the unconstitutional police action. *Id.* Each case, however, must be considered on its own facts to determine whether a balance of the three *Brown* factors favors attenuation or exclusion. *Id.* In any event, consistent with attenuation doctrine jurisprudence, the analysis must hinge upon "whether Petitioner's actions were a new, distinct crime, which was 'so attenuated from the evidence as to purge any taint resulting from said conduct.'" *Id.* (citation omitted).

By way of example, in *United States v. Sprinkle*, the United States Court of Appeals for the Fourth Circuit held that a detainee's intervening crime attenuated the taint of unlawful police conduct so as to render the challenged evidence admissible. 106 F.3d 613, 619-20 (4th Cir. 1997). There, two officers conducted an unlawful traffic stop, during which they told the passenger of the car, Carl Sprinkle, that they were going to frisk him for weapons. *Id*. at 615-16. One of the officers initiated the pat-down, and "[Mr.] Sprinkle pushed away and began to run." *Id*. at 616. After running a short distance, Mr. Sprinkle pulled out a handgun from his pants and shot at one of the officers. *Id*. Eventually, Mr. Sprinkle surrendered and was arrested, and the officers seized his gun. *Id*. Mr. Sprinkle was indicted for being a felon in possession of a firearm. *Id*.

The Fourth Circuit reviewed whether the gun was admissible in evidence against Mr. Sprinkle. *Id*. at 617. To reach its holding that the gun was admissible, the court explained that Mr. Sprinkle's act of pushing, running away from, and firing his gun at the officers constituted a new crime for which the officers had probable cause to arrest Mr. Sprinkle. *Id*. at 619. When Mr. Sprinkle drew and fired his gun, he committed a new crime that "was distinct from any crime he might have been suspected of at the time of the initial stop." *Id*. As a result, the officers had probable cause to arrest Mr. Sprinkle "because the new crime purged the taint of the prior illegal stop." *Id*. Therefore, the officers could seize Mr. Sprinkle's gun, "which was in plain view at the scene of the new crime." *Id*. at 619-20. To hold otherwise, the court explained, "would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Id*. at 619 (citation omitted).

On the other hand, in *United States v. Gaines*, the Fourth Circuit held that a detainee's intermittent crime did not break the causal connection between the police misconduct and discovery of the challenged evidence. 668 F.3d 170, 171 (4th Cir. 2012). There, two officers conducted an unlawful stop of a vehicle. *Id*. at 172. The officers observed Travis Gaines "moving around in his seat and trying to climb over the front seats" of the vehicle. *Id*. at 171. One of the officers asked Mr. Gaines to step out of the car. *Id*. The officer began to frisk Mr. Gains, and he felt "the trigger guard and the handle of a firearm." *Id.* Mr. Gaines struck the officer and began to run away. *Id.* Eventually, the officers arrested Mr. Gaines and recovered the firearm. *Id*.

The Fourth Circuit reviewed whether the gun was admissible as evidence against Mr. Gaines, and ultimately held that it was not. *Id*. Looking to its holding in *Sprinkle*, the court explained that Mr. Sprinkle's handgun was discovered *before* the new and distinct crime occurred. *Id*. at 174. In *Gaines*, however, Mr. Gaines's crime of assault occurred *after* the discovery of the firearm. *Id*. at 173. Therefore, the court determined that Mr. Gaines's crime was not an intervening circumstance. *Id*. As a result, the crime "did not purge the taint of the unlawful stop" and the causal connection between the officer misconduct and discovery of evidence was left intact. *Id.* at 173-75.

In *State v. Owens*, Robert Owens was observed walking out from behind a school late at night in a high crime area. 992 N.E.2d 939, 940 (2013). He was also seen "throw[ing] something in his mouth and tuck[ing] something behind . . . the rear of his waistband," and the odor of marijuana was detected around him. *Id*. An officer approached Mr. Owens and placed him in handcuffs, whereupon Mr. Owens admitted that he put a

- 30 -

blunt in his mouth. *Id.* Subsequently, the officer frisked Mr. Owens for weapons and discovered nothing. *Id.* at 941. Another officer eventually arrived on the scene and saw Mr. Owens "fishing about the rear of his pants [and] reaching his hands down inside his boxer shorts." *Id.* Mr. Owens denied having anything in his pants. *Id.* One of the officers told Mr. Owens that "if [he] d[idn't] want to admit to it," he would be arrested, and the hidden item would be found. *Id.*

When an officer attempted to grab Mr. Owens's license, he "took off running." *Id.* Mr. Owens was eventually apprehended and placed in handcuffs, but he continued to resist the officers. *Id.* He was "basically do[ing] every manner of resisiting he could while still in handcuffs" and "actively trying to grab whatever was in his shorts[.]" *Id.* At some point, one of the officers saw a bag of white powder in Mr. Owens's hand, and upon attempting to grab it, the bag fell to the ground. *Id.* Mr. Owens was ultimately charged with crimes related to drug possession and distribution, along with battery of a law enforcement officer, resisting arrest, and obstruction of justice. *Id.*

The Indiana Court of Appeals, Indiana's intermediate appellate court, reviewed whether the bag of white powder, apparently identified as cocaine, was admissible as evidence against Mr. Owens. *Id.* at 942. After establishing that the initial stop of Mr. Owens was unlawful, the court specifically analyzed whether Mr. Owens's voluntary criminal acts attenuated the taint of the unconstitutional stop. *Id.* at 942-43. Under the circumstances before it, the court held that Mr. Owens's acts did not attenuate the taint of the unlawful stop. *Id.* at 943. The court explained:

Although the alleged cocaine was not actually discovered until after [Mr.] Owens's attempted flight from and battery of the officers, the record clearly indicates that the decision to arrest [Mr.] Owens was made *before* his flight, rendering discovery of the evidence all but inevitable. Because the cocaine had all but been discovered before [Mr.] Owens's flight, his actions cannot be said to have caused its discovery in any meaningful sense. Under the circumstances of this case, the causal connection between the illegal police conduct and the discovery of the cocaine was not broken.

*Id.* Therefore, given that the police misconduct made discovery of the cocaine all but inevitable, independent of Mr. Owens's conduct, the court held that the cocaine must be excluded from evidence. *Id.* at 944. Moreover, the court reasoned that its holding was consistent with the attenuation doctrine's rationale. *Id.* at 943. That is, suppressing the cocaine from evidence neither rewarded nor encouraged behavior that endangered the police, the suspect, or others; and it simultaneously balanced the right of the people to be free from unreasonable searches and seizures and the need to deter police misconduct. *Id.*

Applying the attenuation doctrine to the facts of the case before us, we begin by evaluating the temporal proximity between the officers' misconduct and the discovery of Petitioner's handgun. *See Brown*, 422 U.S. at 603, 95 S. Ct. at 2261-62, 45 L Ed. 2d 416. "The temporal proximity factor weighs against attenuation [and in favor of suppression] if there is no 'substantial time' between the 'unlawful act and when the evidence is obtained.'" *Sizer v. State*, 456 Md. 350, 388, 174 A.3d 326, 348 (2017) (citations omitted). The State concedes that this factor weighs in favor of suppression. The parties agree that mere moments passed between the officers' misconduct and the discovery of the handgun. *See Utah v. Streiff,* 136 S. Ct. at 2058, 136 L.Ed.2d 400 (2016) (concluding that a delay of "only minutes" favored suppression). Likewise, the suppression court found in the case at

bar that there was not a substantial length of time between the unlawful frisk and the discovery of Petitioner's handgun. We conclude that the temporal proximity factor weighs in favor of suppression.

Next, we review whether Petitioner's attempt to flee constituted an intervening act that broke the causal connection between the illegal police conduct and the discovery of the handgun. *See Brown*, 422 U.S. at 603-04, 95 S. Ct. at 2262, 45 L Ed. 2d 416. Here, Petitioner was the subject of a traffic stop. Ordinarily, the purpose of a traffic stop "is to enforce the laws of the roadway, and . . . to investigate the manner of driving with the intent to issue a citation or warning." *Ferris v. State*, 355 Md. 356, 372, 735 A.2d 491, 499 (1999). From the outset of their encounter with Petitioner, the officers acknowledged that this was not an "ordinary traffic stop," and they did not treat it as such. The officers questioned Petitioner for a total of 30-40 seconds. In that time, they never asked for Petitioner's license or registration, nor did they check for outstanding warrants or run his license plate number. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1611, 191 L.Ed.2d 492 (2015) (explaining that "an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). There is no indication in the present case that the officers ever informed Petitioner that they confronted him because he was parked illegally.

According to the officers' testimony, they immediately sought to search Petitioner. First, they asked for permission to search Petitioner's car. Petitioner denied the officers' request. Dissatisfied with that response, Officer Scott threatened to call a K-9 unit to the

- 33 -

scene—a tactic that was apparently employed as a bluff to gauge Petitioner's reaction. *See id.* at 1615, 191 L.Ed.2d 492 (explaining that bringing in a K-9 is not "fairly characterized as part of the officer's traffic mission."). There is no indication that Petitioner's "laid back" demeanor changed in reaction to Officer Scott's bluff. Again, the officers persisted. Officer Zimmerman, at the direction of Officer Scott, ordered Petitioner out of the car. Petitioner complied, and Officer Zimmerman began to frisk Petitioner, prompting Petitioner to run away.

An intervening act is one that "breaks the causal connection between the unlawful conduct and the derivative evidence." *Sizer*, 456 Md. at 389, 174 A.3d at 349. Here, there was no such break in the causal chain. The officers' conduct indicates that when they frisked Petitioner, the officers were executing their intended mission to recover evidence of guns, drugs, or other contraband. From the moment they confronted Petitioner, the officers sought to investigate Petitioner for evidence of a crime, regardless of whether they possessed the requisite quantum of suspicion to render a search of Petitioner reasonable. As a result, we cannot say, on the facts before us, that Petitioner's attempt to flee caused the officers to discover the handgun in any meaningful sense. Not unlike in *Owens*, the officers here decided that they were going to search Petitioner for evidence of a crime— based on an unparticularized hunch that he may possess a weapon—before Petitioner's flight. *See* 922 N.E.2d 939 (2013) (holding that the causal connection between unlawful police conduct and the discovery of evidence remained intact where officers decided to arrest the suspect before he ran away, and therefore the suspect's flight did not cause the evidence's discovery "in any meaningful sense[.]"). Thus, the discovery of Petitioner's

- 34 -

firearm was not caused by his conduct; it was an imminent product of the officers' own predisposition to locate and seize guns and contraband.[17]

Moreover, the officers' persistence indicates "a quality of purposefulness" that invokes the exclusionary rule's principal concern. *See Brown*, 422 U.S. at 604, 95 S. Ct. at 2262, 45 L.Ed.2d 416 (internal quotations omitted) (noting that the exclusionary rule's purpose is to deter police misconduct and that the "'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer jusitifies its cost."). Despite the officers' stated intention to address Petitioner's parking infraction, their conduct reflects that their purpose was to investigate him for criminal activity. The frisk, both in design and execution, was investigatory. As we have described, from the very moment that they confronted Petitioner in his parked vehicle, the officers neglected to

[17] The State contends, and the Court of Special Appeals concluded that, Petitioner's attempt to run away from the officers violated the Transportation Article. As a result, they take the position that the officers had probable cause to arrest Petitioner and search Petitioner incident to the lawful arrest.

The officers may, indeed, have had probable cause to arrest Petitioner for fleeing and eluding, as proscribed by the Transportation Article, and search him incident to arrest. Nonetheless, the handgun at issue was not discovered as a result of Petitioner's flight. For reasons we have explained, the handgun was discovered by exploitation of the unconstitutional frisk. The causal connection between the illegal frisk and the discovery of the handgun was not broken. Therefore, the fact that the officers could have arrested Petitioner for fleeing and eluding does not render the unlawfully obtained handgun admissible as evidence against Petitioner in his prosecution for possession of a firearm after having been convicted of a disqualifying crime. *See State v. Owens*, 992 N.E. 2d 939, 943 (2013) (explaining that evidence related to Mr. Owens's intermittent act of fleeing from and battering police officers should not be suppressed, but the cocaine, as evidence of his drug-related charges, must be suppressed because the causal connection between the illegal police conduct and the discovery of the cocaine was not broken).

follow procedures typical for effectuating a traffic stop. Instead, based on a hunch that Petitioner might be armed, they persistently sought to search Petitioner for evidence of a crime. The officers confronted Petitioner without explanation, asked to search Petitioner's vehicle, and threatened to call a K-9 unit to the scene. Despite Petitioner's compliance with the officers' directives and Petitioner's "laid back" demeanor, Officer Scott ordered Officer Zimmerman to frisk Petitioner for weapons.

Based on the officers' conduct, it appears that they were looking to prompt a reaction from Petitioner and, perhaps, create probable cause or reasonable suspicion to search him. Accordingly, the officers "embarked upon this expedition for evidence in the hope that something might turn up." *Brown*, 422 U.S. at 605, 95 S. Ct. at 2262, 45 L.Ed.2d 416 (internal quotations omitted). We note that their investigation was fraught with the danger of "giv[ing] the appearance of having been calculated to cause surprise, fright, and confusion." *Id*. This is precisely the sort of police misconduct in most need of deterrence, thereby appealing to the primary purpose behind the exclusionary rule. *Strieff*, 136 S. Ct. at 2063, 195 L.Ed.2d 400 (citing *Davis*, 564 U.S. at 236–26, 131 S. Ct. 2419, 180 L.Ed.2d 285 (2011)) (The purpose of the exclusionary rule is to deter police misconduct that is "purposeful or flagrant.").

We emphatically do not condone Petitioner's efforts to run away from the police officers. Regardless of whether Petitioner's conduct violated the Transportation Article, it was improper for Petitioner to attempt to flee from the unlawful frisk. *State v. Blackman*, 94 Md. App. 284, 306, 617 A.2d 619, 630 (1992) ("Even if the frisk would have been unlawful . . . there was no right or privilege on the part of the appellee to resist it by using

force against the officer."). Defendants facing these circumstances should resort to the courts, and not the streets, to resolve the constitutionality of searches and seizures. "There are strong public policy reasons why self-help, involving the use of force against a person, should not be condoned." *Jupiter v. State*, 328 Md. 635, 645, 616 A.2d 412, 417 (1992).

Nonetheless, we cannot overlook the reactive nature of Petitioner's flight, in conjunction with the officers' purposeful and intrusive conduct. *See Miles v. State*, 365 Md. 488, 525, 781 A.2d 787, 808 ("[T]he voluntariness of [the individual's] actions in providing evidence or testimony should be considered as an intervening factor under the attenuation doctrine."); s*ee also Streiff,* 136 S. Ct. at 2062, 195 L.Ed.2d 400 (concluding that the discovery of a valid warrant that "was entirely unconnected with the [unlawful] stop" constituted an intervening circumstance that weighed against suppression). Petitioner's attempt to flee the situation created by the police was directly connected to and a result of the unlawful frisk. In the same vein, we are acutely aware of the non-violent, non-aggressive nature of Petitioner's conduct. There is no evidence on the record to suggest that Petitioner deliberately or even incidentally caused harm or attempted to cause harm to either officer.

Having reviewed the factors delineated in *Brown* in light of the circumstances before us, we hold that the officers' discovery of the handgun in Petitioner's possession was not so attenuated from the officers' unlawful frisk so as to dissipate the taint of their unlawful conduct. Mere moments passed between the unlawful frisk and the discovery of the handgun. Even if Petitioner's flight was improper, it did not constitute an intervening circumstance for purposes of the attenuation doctrine. The officers discovered the gun by

exploiting the illegal frisk and not by reason of Petitioner's reactive conduct. Finally, the officers' conduct was purposeful and calculated for investigatory purposes and was, thus, flagrant. Accordingly, a proper balance of the *Brown* factors renders application of the attenuation doctrine inappropriate in this case. Furthermore, the exclusionary rule's deterrent purpose is served by applying the rule to the present case. Therefore, we hold that the gun removed from Petitioner should have been excluded as evidence.

## CONCLUSION

We hold, in the present case, that Petitioner's Fourth Amendment rights were violated when he was subjected to a frisk that was not supported by reasonable suspicion that he was armed and dangerous. In addition, Petitioner's attempt to flee from the unlawful frisk did not attenuate the causal connection between the unconstitutional conduct and discovery of the handgun. Moreover, the exclusionary rule's deterrent purpose is effectuated by applying the rule to the present case. As such, Petitioner's motion to suppress should have been granted, and the handgun should have been suppressed as evidence against him. Therefore, we reverse the judgment of the Court of Special Appeals, which affirmed the ruling of the Circuit Court for Baltimore City.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT WITH INSTRUCTIONS TO GRANT THE MOTION TO SUPPRESS. RESPONDENT TO PAY THE COSTS.**

Circuit Court for Baltimore City
Case No. 116027021
Argued: February 5, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 51

September Term, 2018

_____

TAMERE THORNTON

v.

STATE OF MARYLAND

_____

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

_____

Dissenting Opinion by Watts, J., which
McDonald, J., joins.

_____

Filed: August 6, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Maryland Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Respectfully, I dissent. I would hold that Officer Jeremy Zimmerman had reasonable articulable suspicion that Tamere Thornton, Petitioner, was armed, and that, accordingly, he was permitted to frisk Thornton.[1]

This case stems from the interaction of two law enforcement officers—Officers Zimmerman and Kenneth Scott—with Thornton as he sat in the driver's seat of a vehicle that the officers approached because it was allegedly illegally parked. At the suppression hearing, Officer Zimmerman testified that he had been trained to assess whether an individual in a vehicle is armed, and that Thornton's movements were consistent with the training he had received indicating that a person is armed. Officer Zimmerman testified that he had been trained to determine whether an individual in a vehicle is armed by looking out for "quick movements that are kind of uncharacteristic with just being seated in a vehicle[,]" such as moving one shoulder up or down "drastically[,]" which indicates that the individual is attempting to either reach under the seat or "further conceal something in [his or her] waistband."

Officer Zimmerman testified in detail about what Thornton did while he was in the driver's seat of the parked vehicle. Officer Zimmerman testified that, as he and officer Scott approached the vehicle, Thornton "raise[d] his right shoulder and kind of br[ought] his elbows together[,] which is consistent with attempting to conceal something in the front

---

[1]Because I would conclude that there was no violation of the Fourth Amendment in the first place, it is unnecessary to address the attenuation doctrine. Were I to address the issue of attenuation, which is the issue that was raised in the petition for a writ of *certiorari*, I would agree with the conclusions in the opinion issued by the Court of Special Appeals. See Thornton v. State, 238 Md. App. 87, 123-38, 189 A.3d 769, 790-98 (2018).

area of your body." Officer Zimmerman testified that Thornton brought his "right shoulder up[,] which kind of br[ought his] hand up a little bit higher[,] and then it was elbows together, kind of pushing down[,]" which was "consistent with an armed person." Officer Zimmerman testified that as he spoke to Thornton, "it was very apparent that he was uncomfortable with whatever was in his lap[;] he kept . . . making adjustments, [and] kept his hands in front of his lap." "[I]t was very clear that [Thornton] was manipulating something[.]" Officer Zimmerman testified that most people feel anxious when approached by a law enforcement officer; however, Thornton was not engaging in "solely nervous movements, based on [Officer Zimmerman's] training and experience. These were armed person characteristics." Officer Zimmerman testified that after Thornton "attempt[ed] to adjust something in his waistband . . . two or three times[,]" the officers asked him to exit the vehicle. Thornton did so, then fled. Officer Zimmerman pursued him, Thornton slipped or fell, and Officer Zimmerman got on top of him and saw a handgun on the ground under Thornton.

Officer Scott also testified at the hearing. The circuit court found that Officer Scott's "testimony frankly was unconvincing" because "his testimony actually [was] somewhat inconsistent with his genuine belief that there might be a weapon involved[,]" and because, while testifying, he had "give[n] very few details about" the "furtive conduct consistent with possession of a weapon" that he had purportedly observed Thornton engaging in. But, the circuit court found that "Officer Zimmerman's testimony [was] substantially different" because

[t]here was much greater detail as to what the specific motions were that

constituted proof or suggestion that [Thornton] was possibly armed[,] and he acted it out on the stand, and[,] for purposes of the record, he specifically dipped a shoulder, straightened up, reaching for the belt area[,] and one could see how that motion, if it took place as it [was] described, could be consistent with adjusting the position of a gun in the waistband[,] or in some other actions toward the [waist]band.

Although the circuit court found the "search" to be unlawful, the circuit court seemed to proceed on the assumption that what Officer Zimmerman said happened, happened. Indeed, the circuit court stated: "All [the officers] have is [Thornton's] conduct with his hands while he's being approached by the police officers." Similarly, the circuit court stated: "[T]he only indicator of potential criminal conduct was the furtive motions of [Thornton's] hands[,] which [the officers] felt might have indicated the presence of a gun[.]" Like the circuit court, the Majority apparently does not dispute that Officer Zimmerman's testimony was accurate; indeed, the Majority notes that Officer Zimmerman's "description of [Thornton's] movements was deemed more credible and specific than that of Officer Scott[.]" Maj. Slip Op. at 20.

In my view, if the critical portions of Officer Zimmerman's testimony were credible—namely, that Thornton made specific hand and shoulder movements that, per Officer Zimmerman's training, indicated that he was armed—then Officer Zimmerman had reasonable articulable suspicion to pat Thornton down for weapons. As this Court explained in Norman v. State, 452 Md. 373, 387, 156 A.3d 940, 948 (2017), "[r]easonable articulable suspicion is a commonsense, nontechnical concept that depends on practical aspects of day-to-day life; as such, a court must give due deference to a law enforcement officer's experience and specialized training, which enable the law enforcement officer to

- 3 -

make inferences that might elude a civilian." (Citation omitted). Here, Officer Zimmerman testified that he had been trained to identify armed individuals in vehicles by looking out for one shoulder moving up or down to a great degree, and that, consistent with an armed individual, Thornton had raised his right shoulder, brought his elbows together, kept his hands on his lap, and tried to adjust something in his waistband two or three times. Given that the circuit court treated these portions of Officer Zimmerman's testimony as credible, Officer Zimmerman possessed reasonable articulable suspicion that Thornton was armed.

According to the Majority, "both officers had training and experience in identifying armed individuals, which their testimony indicated that they drew upon in suspecting that [Thornton]'s movements were indicative of an armed individual." Maj. Slip Op. at 21. The Majority, however, does not credit any of Officer Zimmerman's detailed testimony regarding his training, and merely concludes that "the frisk of [Thornton] was based on an inchoate and unparticularized hunch that [he] possessed a weapon." Id. at 24. The Majority lists multiple reasons for its conclusion, none of which are persuasive.

The Majority asserts: "In our view, the officers' testimony failed to set forth particularized facts that would warrant an objective officer to believe that he or she was in danger." Id. at 20. Contrary to the Majority's assertion, there was an additional circumstance that, in conjunction with Thornton's hand and shoulder movements, gave Officer Zimmerman reason to suspect that he was armed and dangerous. That circumstance was Officer Zimmerman's training, which indicated that, when in a vehicle, an armed individual will tend to move one shoulder up or down to a great degree—which

- 4 -

is exactly what Thornton did.

The Majority states: "The officers did not testify to having observed [Thornton] reach under his seat or make any of the quick movements described above[,]" Maj. Slip Op. at 22, and that Thornton "was described as "laid back,'" Maj. Slip Op. at 24. Yet, Officer Zimmerman testified that Thornton's movements were consistent with being armed, not with simply being nervous or anxious due to the officers' presence. It is not material that Thornton did not reach under the seat. Officer Zimmerman's testimony demonstrated that the handgun was hidden in Thornton's waistband, not under the seat. Also, it was not necessary for Thornton to reach into his waistband for the officers to have reasonable articulable suspicion that there was a gun in his waistband. Indeed, Officer Zimmerman observed that Thornton "attempt[ed] to adjust something in his waistband . . . two or three times[.]"

The Majority also asserts that "Officer Zimmerman explained common characteristics of armed individuals in general." Maj. Slip Op. at 22. This is not entirely accurate; Zimmerman gave a particularized reason for believing Thornton was armed, which, per Officer Zimmerman, was his training as to how an armed individual in a vehicle acts. The Majority acknowledges that "Officer Zimmerman saw [Thornton] 'raise his right shoulder and kind of bring his elbows together,'" but states: "Nonetheless, the fact that Officer Zimmerman was trained to believe that armed individuals may move 'a shoulder . . . up or down drastically,' and that he saw [Thornton] move his right shoulder is not, by itself, dispositive to our reasonable suspicion analysis. Rather, it is but one factor to be considered among the totality of the circumstances." Maj. Slip Op. at 22-23 (footnote

omitted). The majority opinion appears to rely on case law that an officer's belief that a person who is involved in drug trafficking would also be carrying weapons would not alone provide reasonable suspicion to support a frisk. See Maj. Slip Op. at 23 n.15. This case does not involve an officer's belief that Thornton was armed and dangerous based on his involvement in drug trafficking. Here, Officer Zimmerman testified that the very behavior he observed, based on his training, was indicative of a reason to believe that a person may be armed.

The Majority states that "the officers failed to articulate an objective basis or provide a justification for suspecting that [Thornton] was manipulating or adjusting a weapon in his waist area rather than some innocent object." Maj. Slip Op. at 23 (emphasis omitted). The Majority seems to take the view that, when a law enforcement officer testifies that a suspect is manipulating an item in his or her waistband, the officer must somehow prove or establish that the item was not an innocent object. I cannot fathom how an officer would go about proving this, especially given that, under such circumstances, the waistband is hiding the item from the officer's view. In any event, it was unnecessary for Officer Zimmerman to prove that the item that Thornton was manipulating was not an innocent object; the manipulation itself, combined with Officer Zimmerman's other testimony regarding Thornton's movements and Officer Zimmerman's training, indicated that Thornton was armed.

The Majority asserts that "Officer Zimmerman conceded that [Thornton]'s movements may have been consistent with innocent conduct." Maj. Slip Op. at 23. More specifically, the Majority claims that "Officer Zimmerman acknowledged that

[Thornton]'s shifting around during the traffic stop could have been attributable to the fact that there were officers on either side of his vehicle, and he was shifting to answer the officers' questions, rather than adjusting a weapon in his waistband or performing a weapons check." Id. The record reflects that this characterization of Officer Zimmerman's testimony is also not entirely accurate. Ostensibly, the Majority bases its statements on the following exchange during Officer Zimmerman's cross-examination:

> [THORNTON'S COUNSEL: Y]ou understand that just by approaching a person in a vehicle, just by virtue of the fact that a police officer approaches a vehicle, you're going to initiate an amount of anxiety in most normal people; right? Because most normal people don't get pulled off by police officers every day; right?
>
> [OFFICER ZIMMERMAN:] Sure.
>
> [THORNTON'S COUNSEL:] So when you say that you observed certain behaviors of moving to one side or moving around, that wouldn't be inconsistent with a person who's just nervous because there's police officers asking them lot of questions; right?
>
> [OFFICER ZIMMERMAN:] I would say that in my career, I've dealt with thousands of people and understand that most people are more nervous around police than they maybe are around anyone else --
>
> [THORNTON'S COUNSEL:] Is that right?
>
> [OFFICER ZIMMERMAN:] Correct. However, **these were not nervous movements, solely nervous movements, based on my training and experience. These were armed person characteristics.**

(Emphasis added). To the extent that the Majority interprets this exchange to mean that Officer Zimmerman agreed with Thornton's counsel's assertion that Thornton's behavior was not "inconsistent with a person who's just nervous because there's police officers asking them lot of questions[,]" this does not reflect the entirety of the exchange between

- 7 -

Thornton's counsel and Officer Zimmerman. Regardless of whether Officer Zimmerman momentarily agreed with Thornton's counsel's assertion, Officer Zimmerman unequivocally testified that, "based on [his] training and experience[,]" Thornton was demonstrating "armed person characteristics" rather than engaging in "solely nervous movements[.]"

Finally, the Majority notes that "the suppression court found that, during the exchange, the officers acted in a manner that was largely inconsistent with a genuine belief that [] Thornton was armed and dangerous." Maj. Slip Op. at 24. In determining whether an officer has reasonable articulable suspicion that an individual is armed, case law does not require a subjective inquiry into whether the officer displayed conduct indicating that the officer was concerned about his or her personal safety. Instead, the objective question is whether, "under the totality of the circumstances, and based on reasonable inferences from particularized facts in light of the law enforcement officer's experience, a reasonably prudent law enforcement officer would have felt that he or she was in danger." Norman, 452 Md. at 387, 156 A.3d at 948.

In this and all other cases involving an issue as to reasonable articulable suspicion, the analysis is highly fact-specific. Even so, the majority opinion will affect decisions by both trial courts and appellate courts in future cases. This is concerning, as the majority opinion ignores the circumstance that Officer Zimmerman testified that Thornton engaged in conduct that, according to Officer Zimmerman's training, was consistent with that of an armed individual; and, the circuit court and the majority opinion treated Officer Zimmerman's testimony as credible. As a precursor to finding reasonable articulable

suspicion that Thornton was armed, the majority opinion seems to require that Officer Zimmerman's testimony demonstrate with certainty that Thornton was concealing a gun in his waistband. This is too high a standard for the establishment of reasonable articulable suspicion.

For the above reasons, respectfully, I dissent.

Judge McDonald has authorized me to state that he joins in this opinion.