*Eric Allen Harley v. State of Maryland*, No. 529, Sept. Term 2024. Opinion by Arthur, J.

**CRIMINAL LAW—FOURTH AMENDMENT VIOLATIONS—INDEPENDENT SOURCE DOCTRINE**

The independent source doctrine and the inevitable discovery doctrine are two well-established exceptions to the exclusionary rule, which generally renders evidence inadmissible in a criminal prosecution when police obtain the evidence in violation of the Fourth Amendment. The inevitable discovery doctrine applies when the evidence was not discovered by lawful means, but inevitably would have been. In contrast, the independent source doctrine applies when the evidence was discovered by lawful means notwithstanding some unlawful conduct by the police. Under the independent source doctrine, if the State can show that the source of the evidence was completely independent of the constitutional violation, that violation will not render the evidence inadmissible.

In this case, despite his protest, the officers detained Harley in his home for over three hours while they waited for a warrant to search his home for evidence of an armed robbery. The warrant application did not mention anything that the officers had observed or learned while in Harley's home. After obtaining and executing the search warrant, the officers discovered a large quantity of marijuana and a ghost gun, but nothing related to the armed robbery. After obtaining and executing a second search warrant, the officers discovered more marijuana, more ghost guns, and a 3D printer. While being prosecuted for his possession of this contraband, Harley moved to suppress the evidence, arguing that the officers violated the Fourth Amendment by remaining in his home after he had ordered them to leave, that the evidence would be admissible only if the State proved its admissibility under the inevitable discovery doctrine, and that the initial search warrant was not based on probable cause. The State argued that the contraband was admissible under the independent source doctrine because the evidence was discovered pursuant to a valid search warrant that was based on probable cause and was independent of Harley's detention. The circuit court assumed that Harley's detention was unlawful, determined that the warrant provided a lawful and independent source of the evidence, and admitted the contraband into evidence.

The Appellate Court of Maryland held the circuit court did not err in admitting the evidence. The Court concluded that this was an independent source case because, even if the police violated Harley's Fourth Amendment rights by remaining in his home after he demanded that they leave, the officers did not discover the contraband by those unlawful means. Rather, the officers discovered the evidence through a lawful search warrant that was based on probable cause derived from information solely about the armed robbery. The Court reasoned that the initial search warrant provided a lawful source of the evidence, independent of the presumed unlawful detention, because the police decided to apply for the warrant prior to their entry into Harley's home, the warrant application

made no reference to any observations made while in the home, and the warrant application provided a substantial basis to conclude that there was probable cause to issue the warrant.

## CRIMINAL LAW—EVIDENCE AT SUPPRESSION HEARINGS

The Maryland Rules of Evidence do not apply to suppression hearings. Md. Rule 5-101(b)(14). Additionally, Maryland Rule 5-101(c)(1) grants trial courts broad discretion to decline to strictly apply the rules of evidence when making certain determinations of questions of fact preliminary to the admissibility of evidence. Accordingly, because suppression hearings involve the determination of preliminary questions concerning the admissibility of evidence, a trial court has broad discretion to decline to strictly apply the rules of evidence during suppression hearings. For these reasons, a court may accept a proffer in determining whether evidence is admissible.

In this case, Harley insisted that the contraband discovered in his home would be admissible only if the State proved its admissibility under the inevitable discovery doctrine. At the suppression hearing, Harley asked to put on officer testimony and show body-worn camera footage from his detention, claiming that the testimony and footage would reveal why the discovery of the contraband was not inevitable. Harley proffered that his evidence would show the events that occurred before and during his detention, including what the officers told him about why he was being detained. The court understood Harley to be proffering that the initial warrantless entry into his home and his detention therein were illegal. The court expressly assumed that all of Harley's proffered assertions were true. The court, therefore, declined to consider Harley's evidence because it would only duplicate the proffer.

The Appellate Court of Maryland held that the circuit court did not abuse its discretion in declining to allow Harley to put on officer testimony and body-worn camera footage. The Court concluded that the circuit court did not need to hear evidence that tended to prove the illegality of the detention, which the court had expressly accepted as true based on Harley's uncontested proffers. Additionally, the Court reasoned that, because the State had the burden of proving the applicability of an exception to the exclusionary rule, and because it did not rely on the inevitable discovery doctrine, the circuit court was not obligated to consider Harley's evidence about an argument that the State did not make.

Circuit Court for Anne Arundel County
Case No. C-02-CR-23-001764

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 529

September Term, 2024

_____


ERIC ALLEN HARLEY

v.

STATE OF MARYLAND

_____

Berger,
Arthur,
Reed,


JJ.
_____
_____

Opinion by Arthur, J.

_____

Filed: August 27, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Police officers detained Eric Harley in his home for over three hours while they waited for a warrant to search his residence for evidence of an armed robbery. The warrant application did not mention anything that the officers learned or observed while they were in Harley's home.

When the officers finally obtained the warrant and executed the search, they found, among other things, a large quantity of marijuana and a non-serialized firearm, i.e., a ghost gun. Once the officers had found those items, they obtained and executed another warrant, which led to the discovery of more marijuana, numerous other ghost guns, and a 3D printer that could be used to manufacture ghost guns.

Harley moved to suppress the contraband, arguing that the officers had violated his Fourth Amendment rights by detaining him in his home after he had ordered them to leave. The State argued that the contraband was admissible under the independent source doctrine, an exception to the exclusionary rule, under which evidence seized pursuant to a warrant is admissible even if law enforcement officers engaged in some illegal conduct, as long as the officers had an independent source for the warrant. *See, e.g.*, *Kamara v. State*, 205 Md. App. 607, 624-25 (2012). The Circuit Court for Anne Arundel County denied Harley's motion.

Harley entered a conditional guilty plea, under which he retained the right to challenge the suppression ruling. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

## Armed Robbery

Shortly before 10:00 p.m. on Tuesday, May 2, 2023, the Annapolis Police Department responded to a call regarding an armed robbery in a residential parking lot. When the officers arrived at the scene, a woman explained that two men in dark clothing had approached her, pistol-whipped her with a black and gold handgun, and stolen her black purse, which contained her bank cards, house keys, driver's license, and other personal documents.

While on the scene with the officers, the woman received bank transaction notifications on her phone. The notifications informed her that her bank card had been used at a gas station located roughly one-half mile from the scene of the robbery. The officers left for the gas station and arrived there just before 11:00 p.m.

At the gas station, the officers reviewed surveillance footage and identified two suspects who were wearing dark clothing and had purchased lottery tickets with the woman's bank card. A detective found lottery receipts in one of the gas station's trash cans. The receipts showed that the last four digits of the card used to purchase the tickets match the last four digits of the robbery victim's bank card.

The surveillance video showed the suspects leaving the gas station in a silver Hyundai Sonata. The officers reported the license plate number and a description of the car at approximately 11:16 p.m.

At around 11:30 p.m., police officers found the Sonata parked, running, and unattended in front of a home on Tyler Avenue, which was located roughly one-third of a

mile from the gas station. Within minutes, the officers saw two men in dark clothing exit the home and walk toward the Sonata. The officers approached the Sonata, searched it, and found the victim's bank card in the center console. Both men were detained and charged with the armed robbery. The officers found no firearm and no other items belonging to the robbery victim on the suspects or in the Sonata.

## Detention in Harley's Home

After arresting the armed robbery suspects, an officer applied for a warrant to search the home that the suspects had just exited. The officers sought evidence of the armed robbery that was not already found in the Sonata, including any black handbags, black and gold handguns, lottery tickets or receipts, and personal documents belonging to the victim.

Meanwhile, at around 12:00 a.m. on Wednesday, May 3, 2023, the officers approached the Tyler Avenue residence, which is owned by Harley and his wife. The officers did not suspect that Harley had been one of the robbers.

Perhaps pretextually, the officers asked Harley if they could come inside to discuss the armed robbery suspects. Harley agreed to talk and allowed the officers to enter his home. Once inside, the officers informed Harley that he would be detained and that his home would be secured while they waited for a search warrant.

One officer explained to Harley, his wife, and Harley's attorney—whom Harley had called on a speakerphone—that the house was being secured to prevent the removal or destruction of evidence. Harley, revoking his consent for the officers to remain in his home, protested the detention and insisted that the officers leave. The officers refused.

3

They allowed Harley's wife and children to leave, but they required Harley to stay. The officers did not place Harley in handcuffs, but they prohibited him from moving about his home without an officer as his chaperone. For example, the officers did not permit him to use the bathroom unless an officer stood outside the door.

The record from the suppression hearing contains no evidence suggesting that the officers searched Harley's home at any point after they impounded the house and waited for the warrant.

**Warrants and Contraband**

A judge issued a search warrant at 3:18 a.m. The officers executed the search at 3:40 a.m. At that point, Harley had been detained for approximately three and a half hours.

The search yielded no evidence of the armed robbery. However, the officers did find approximately 11 pounds of marijuana in a hallway trash can and a ghost gun in a bedroom. These discoveries prompted the officers to apply for a second warrant to seize any other illegal drugs and any parts or equipment that may be used to manufacture non-serialized firearms. Upon receiving the second warrant, the officers continued their search and seized, among other things, more bags of marijuana, numerous non-serialized firearms and firearm components, and a 3D printer.

Based on the contraband found in his home, Harley was arrested and charged with possession of cannabis with the intent to distribute it, conspiracy to distribute cannabis, possession of non-serialized firearms, and conspiracy to transfer non-serialized firearms.

4

## Suppression Hearing

Before trial, Harley moved to suppress all of the contraband from evidence, alleging a Fourth Amendment violation. At the suppression hearing, he argued that the initial warrant was not based on probable cause and that no exigency warranted the officers' entry into his home or his detention therein. Harley claimed that his detention and the searches were all unlawful, so that anything found inside his home must be excluded from evidence.

Harley insisted that the contraband would be admissible only if the State proved that it was admissible under the inevitable discovery doctrine, an exception to the exclusionary rule that applies "'where evidence is not actually discovered by lawful means, but inevitably would have been.'" *Williams v. State*, 372 Md. 386, 410 (2002) (quoting *State v. Winkler*, 552 N.W.2d 347, 354 n.4 (N.D. 1996)) (further internal citation and quotation marks omitted); *accord Kamara v. State*, 205 Md. App. 607, 624 (2012). Harley asked to put on officer testimony and show body-worn camera footage from his three-and-a-half-hour detention. He claimed that the testimony and footage would reveal why the discovery of the contraband was not inevitable.

The State countered that, even if the detention were illegal, the contraband was still admissible under the independent source exception to the exclusionary rule. The State argued that the court need not determine whether Harley's detention was, in fact, unlawful, because the search warrants were based on probable cause and were independent of any information obtained as a result of Harley's detention. The State maintained that the first search warrant was solely and sufficiently based on the armed

robbery and not on anything that the officers had learned while they were detaining Harley; that the marijuana and ghost gun found during the first search created a lawful, independent basis for the second warrant; and that all of the contraband seized pursuant to the searches was, therefore, admissible.

The circuit court denied Harley's request to present testimony and video evidence, finding it "[ir]relevant to the issue" before it. Instead, the court accepted as true Harley's factual representations and the State's qualified concessions about the illegality of the detention.

The court found that the initial warrant was valid because there was a substantial basis to support the issuing judge's conclusion that there was probable cause to issue the warrant. Having found that the officers had obtained a valid search warrant, the court determined that the independent source doctrine, not the inevitable discovery doctrine, applied in this case. The court concluded that, even assuming that Harley's detention was unlawful, the contraband initially seized from Harley's home was admissible because the searches were not the direct or indirect result of the detention, and because the valid warrants provided untainted, independent bases for the discovery and seizure of the additional contraband. Thus, the court denied Harley's motion to suppress.

**Conditional Plea and Appeal**

Harley entered a conditional guilty plea to charges of possession of cannabis with the intent to distribute it and conspiracy to transfer non-serialized firearms. He retained

6

the right to challenge the court's suppression ruling.  He filed a timely appeal, and his sentence was stayed pending the outcome.[1]

On appeal, the parties ask fundamentally the same two questions.[2]  In the interest of concision, we have rephrased them as follows:

---

[1] Harley was sentenced to eight years of local incarceration with all but 18 months suspended.  In August 2024, his sentence was modified to eight years of incarceration at the Department of Corrections with all but 12 months and one day suspended.

[2] Harley formulated his questions as follows:

> 1. Did the Circuit Court err in declining to require the State to prove inevitable discovery of contraband eventually discovered pursuant to a search warrant, where such contraband was located only after lengthy unlawful detention of the Defendant in his residence prior to the issuance of that search warrant?

> 2. Did the Circuit Court err in refusing to allow Defendant to introduce sworn testimony and other evidence in support of his argument that the inevitable discovery doctrine should apply in this case?

The State formulated its questions as follows:

> 1. Did the circuit court properly deny the motion to suppress evidence found in Harley's home?

> 2. Did the circuit court properly exercise discretion in accepting Harley's proffer of evidence at the suppression hearing in lieu of testimony?

I.   Did the circuit court err in denying Harley's motion to suppress?

II.  Did the circuit court abuse its discretion by accepting factual representations instead of receiving evidence at the suppression hearing?

We answer each question in the negative.  For the reasons set forth below, we affirm the denial of the motion to suppress.

## STANDARDS OF REVIEW

### I. Motion to Suppress

We review the denial of a motion to suppress evidence under the Fourth Amendment "based solely on the record of the suppression hearing."  *Williams v. State*, 372 Md. 386, 401 (2002); *accord Thornton v. State*, 465 Md. 122, 139 (2019) (quoting *Sizer v. State*, 456 Md. 350, 362 (2017)).  We consider all evidence and inferences drawn therefrom in the light most favorable to the State as the prevailing party on the motion. *Williams v. State*, 372 Md. at 401.  "[W]e defer to the hearing court's findings of fact unless they are clearly erroneous[,]" *Thornton v. State*, 465 Md. at 139.  But we afford no deference to the hearing court's legal conclusions and, instead, make an "'independent constitutional evaluation'" about whether the challenged evidence should be suppressed. *Id.* (quoting *Sizer v. State*, 456 Md. at 362); *Williams v. State*, 372 Md. at 401.

### II. Evidence at the Suppression Hearing

"Because suppression hearings involve the determination of preliminary questions concerning the admissibility of evidence," courts have "broad discretion to decline to strictly apply the Rules of Evidence."  *Matoumba v. State*, 390 Md. 544, 552 (2006) (discussing the relationship between Maryland Rules 5-101(c)(1) and 5-104(a)).  We,

8

therefore, review evidentiary decisions made during a suppression hearing for an abuse of discretion that materially prejudices a defendant. *Id.*; *accord In re Ashley E.*, 387 Md. 260, 280 (2005). A suppression court "abuses its discretion when it acts without reference to any guiding principles or rules of law[,] or where no reasonable person would take the view adopted" by the court. *Matoumba v. State*, 390 Md. at 552.

## DISCUSSION

### I. Motion to Suppress

The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, prohibits unreasonable searches and seizures. *See, e.g.*, *Thornton v. State*, 465 Md. 122, 140 (2019); *Williams v. State*, 372 Md. 386, 401 (2002). Generally, when the police obtain evidence in violation of the Fourth Amendment, the exclusionary rule makes that evidence inadmissible in a criminal prosecution. *See, e.g.*, *Thornton v. State*, 465 Md. at 150; *Kamara v. State*, 205 Md. App. 607, 623 (2012). The exclusionary rule exists to deter Fourth Amendment violations by excluding evidence that stems from the government's unconstitutional investigatory conduct. *See, e.g.*, *Thornton v. State*, 465 Md. at 150.

There are, nonetheless, a number of well-established exceptions to the exclusionary rule, under which ill-discovered evidence may still be admissible. *See, e.g.*, *Kamara v. State*, 205 Md. App. at 623. These exceptions include (1) the inevitable discovery doctrine, (2) the independent source doctrine, and (3) the attenuation doctrine. *Id.* All three of these doctrines "aim to balance the interests of society in deterring unlawful police conduct with the interest of ensuring juries receive all probative evidence

9

of a crime." *Williams v. State*, 372 Md. at 410. All of them generally pertain to whether there is a causal connection between a violation of the Fourth Amendment and the discovery of the evidence.

The third doctrine, attenuation, is not at issue in this case. *See Miles v. State*, 365 Md. 488, 516-29 (2001) (discussing the attenuation doctrine).[3] Here, the parties disagree about whether the independent source doctrine or the inevitable discovery doctrine applies.

Although "[t]he doctrines of inevitable discovery and independent source are closely related," "'they are analytically distinct[]'" and mutually exclusive. *Kamara v. State*, 205 Md. App. at 624 (quoting *Williams v. State*, 372 Md. at 410). Because the two doctrines apply in separate circumstances, and because the parties do not agree about which circumstances this case presents, a summary of each is apposite.

The inevitable discovery doctrine applies where the authorities have obtained information by unlawful means, but would inevitably have obtained it lawfully. *See Williams v. State*, 372 Md. at 410. "Its focus is on *what would have happened* if the illegal search had not aborted the lawful method of discovery." *Id.* (emphasis added) (internal citations and quotation marks omitted).

---

[3] Under the attenuation doctrine, "'[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that'" the alleged taint caused by the unconstitutional conduct is purged, and "'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *State v. Carter*, 472 Md. 36, 72 (2021) (internal citation omitted); *see also Miles v. State*, 365 Md. at 521.

10

For example, in *Nix v. Williams*, 467 U.S. 431 (1984), the prosecution had obtained information about the whereabouts of the victim's body in violation of the defendant's Sixth Amendment right to counsel. The Court held, however, that, notwithstanding the violation, evidence of the location and the condition of the body was admissible because a comprehensive search was underway and would inevitably have led to its discovery. *Id.* at 448-50.

By contrast, in *Williams v. State*, 372 Md. at 395, the police had illegally entered the defendant's motel room, searched it, and found marijuana on the bed and cocaine in his pajamas. The State argued that a pending search warrant was sufficient to show that the drugs inevitably would have been found upon the execution of the warrant. *Id.* at 427. The Court disagreed. It was unpersuaded that the defendant "inevitably would have been in the motel rooms," wearing his pajamas, "when the police executed the search warrant." *Id.* at 426. Moreover, the Court thought it "speculative to suggest that the small amount of marijuana on the bed would have been discovered during a search pursuant to the warrant." *Id.* at 427.

In contrast to the inevitable discovery doctrine, the independent source doctrine applies when law enforcement officers may have engaged in some illegal conduct, but the evidence actually has been discovered by lawful means. *Id.* at 410. The independent source doctrine does not focus on what might have happened had illegal conduct not occurred, but "on *what actually happened*—was the discovery tainted by the illegal[ity]?" *Id*. at 410 (emphasis added) (internal citations omitted). "'[U]nder the independent source doctrine, evidence that was in fact discovered lawfully, and not as a direct or

11

indirect result of illegal activity, is admissible.'" *Id.* (quoting *United States v. Herrold*, 962 F.2d 1131, 1140 (3d. Cir. 1992)) (emphasis omitted).  In other words, under the independent source doctrine, "if the State can show that the source of the evidence was 'wholly independent of any constitutional violation,'" then the constitutional violation "will not render the evidence in question inadmissible." *State v. Lee*, 374 Md. 275, 298 (2003) (quoting *Nix v. Williams*, 467 U.S. at 443).

For example, in *Murray v. United States*, 487 U.S. 533, 535 (1988), federal law enforcement agents lawfully seized a truck that contained marijuana, but unlawfully entered a warehouse from which the truck had departed.  In the warehouse, the agents observed burlap-wrapped bales.  *Id.*  They left without disturbing the bales and applied for a warrant to search the warehouse.  *Id.*  The warrant application did not mention the illegal entry or anything that the agents had observed during the illegal entry.  *Id.* at 535-36.  Upon executing the warrant, the agents discovered 270 bales of marijuana.  *Id.* at 536.

In holding that the independent source doctrine might support a decision not to suppress the drugs found in the search, the Court reasoned: "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . [,] there is no reason why the independent source doctrine should not apply." *Id.* at 542.  The Court explained:

> Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry.  But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply.  Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one.

*Id.* at 541 (emphasis in original).[4]

In this case, the State argues that the contraband found during the initial search of Harley's home was admissible under the independent source doctrine. The State relies prominently on this Court's opinion in *Kamara v. State*, 205 Md. App. 607 (2012).

In that case, an undercover officer engaged an unwitting suspect to purchase marijuana for him from within a residence. *Id.* at 614. After the suspect had purchased the marijuana, returned with it, and been placed under arrest, another officer saw Kamara emerge from the residence and engage in a hand-to-hand drug transaction just outside of it. *Id.* After about 15 minutes, the officer decided to approach the residence, knock on the door, and see whether he could obtain information about what was happening inside. *Id.*

Accompanied by two other officers, all of whom were wearing bulletproof vests, armbands, and badges, the officer knocked on the front door. *Id.* at 614-15. When Kamara answered, the officer observed "a 'large fold of money in [an] open pocket in [his] sweater.'" *Id.* at 615. To determine whether Kamara was the subject of any open warrants, the officer took his identification card and refused to return it. *Id.* Another officer informed Kamara that he and his brother would be detained while the officers sought a warrant. *Id.* The officers handcuffed Kamara and his brother and patted them down. *Id.*

---

[4] Ultimately, however, the Court vacated a judgment against the defendant and remanded for findings about whether the agents would have sought a warrant if they had not entered the warehouse. *Id.* at 543.

Two officers "performed a protective sweep of the residence to make sure no one else was present." *Id.* The officers "did not open drawers or move anything[,]" but they saw, in plain view, marijuana and a scale. *Id.* at 615-16.

During the approximately four hours between the time when the officers entered the residence and when they obtained a search warrant, they did not question Kamara (though he volunteered some incriminating statements). *Id.* at 616. When they executed the warrant, the officers found marijuana, cash (including some of the cash that the unwitting suspect had used to purchase marijuana), and a digital scale. *Id.* at 617.

In response to Kamara's motion to suppress, the circuit court concluded that "the entry into the home and the protective sweep were unlawful[.]" *Id.* at 618. The court, however, declined to suppress evidence of the drugs. *Id.* at 619. It reasoned that the warrant, which was based in part on the information that the officers had obtained before the illegal entry, was an independent source for the discovery of the drugs. *Id.*

On appeal, this Court affirmed. We recognized that "even if there is initial illegal conduct, evidence seized pursuant to a subsequent warrant may be admissible pursuant to the independent source doctrine." *Id.* at 624-25. We reasoned that because "the police planned to get a warrant prior to the protective sweep or the discovery of any contraband[,]" "the search warrant was not prompted by what the officers saw during the initial protective sweep." *Id.* at 628. We also reasoned that, although the warrant application contained a paragraph referring to the drugs found during the initial entry and search, the warrant would still be lawful "[i]f the remaining information in the warrant, apart from the tainted information, establishes probable cause[.]" *Id.* "[O]nce the

14

paragraph referring to the evidence observed during the protective sweep [was] excluded, the remaining information in the affidavit contain[ed] adequate facts from which a judge could have concluded that probable cause existed for the issuance of the search warrant." *Id.* at 630. Thus, the warrant was supported by probable cause, independent of the information that the officers had obtained while they were illegally detaining Kamara in his house and making observations during the protective sweep.

*Kamara* compels the conclusion that seizure of the contraband in this case was valid under the independent source doctrine. Even if the officers illegally refused to leave Harley's residence when he ordered them to go and illegally detained him while they awaited the warrant, the initial warrant application was not based on anything that the officers learned as a result of any violation of Harley's Fourth Amendment rights. To the contrary, the initial warrant application was based entirely on information that the officers had learned before Harley ever allowed them into his house.

The record establishes that the officers planned to get a search warrant before they ever entered Harley's home. Moreover, the warrant application contains only information about the armed robbery, the suspects, and the evidence that was known but not yet found at the time of the warrant application. Accordingly, even if the officers saw any contraband during their entry into Harley's home (and there is no evidence that they did), nothing they saw prompted their decision to get a warrant or was included in the warrant application.

This is an independent source case, as the circuit court acknowledged when it stated in its ruling "that nothing in th[e] first search warrant came from or was developed

15

by the detention of Mr. Harley in his home before they got that warrant[,] . . . and then the second warrant [was] based on information they found during the first warrant[ed] search.]" In fact, if anything, this is an even stronger independent source case than *Kamara* was, because in *Kamara* this Court needed to excise the information that the officers had obtained during their illegal sojourn in Kamara's house.

Harley argued before the suppression hearing court, and maintains on appeal, that the initial search warrant was not based on probable cause, i.e., that there was not "'a fair probability that contraband or evidence of [the] crime [would] be found'" in his house. *Kamara v. State*, 205 Md. App. at 630 (quoting *Agurs v. State*, 415 Md. 62, 76 (2010)) (further internal citation and quotation marks omitted). He claims that the officers' "investigative trail [had] grown cold" because more than two hours had passed between the robbery victim's 911 call and when the officers found the Sonata in front of Harley's home. He suggests that the suspects could have gone to any number of places and disposed of evidence of the armed robbery and that they could have gone to Harley's house for any number of innocuous reasons. So, Harley argues, the issuing judge had "no compelling reason to think [that evidence of the armed robbery] *would* be found" in his home. (Emphasis added by Harley.)

Our review of a probable cause determination "is limited to determining whether [the] issuing magistrate had a substantial basis for concluding that [a] search would uncover evidence of wrongdoing[.]" *Longshore v. State*, 399 Md. 486, 522 (2007); *State v. Jenkins*, 178 Md. App. 156, 163-64 (2008). "The substantial basis standard involves 'something less than finding the existence of probable cause,'" *State v. Coley*, 145 Md.

16

App. 502, 521 (2002) (quoting *State v. Amerman*, 84 Md. App. 461, 470-71 (1990)), "and 'is less demanding than even the familiar "clearly erroneous" standard by which appellate courts review judicial fact finding in a trial setting.'" *Id.* (quoting *State v. Amerman*, 84 Md. App. at 472). "The court's responsibility . . . [is] not to assess to its satisfaction the existence of probable cause, but, rather, to determine if the issuing magistrate's decision was supported by substantial evidence." *Id.* "In making that determination, the magistrate's decision is to be afforded great deference." *Id.*

Here, the initial warrant application contained the following pertinent facts: (1) the police tracked two armed robbery suspects from a local gas station to Harley's home within approximately an hour and a half of responding to the robbery; (2) when the police found the suspects' car, it was left "stationary, running[,] and unoccupied" in front of Harley's home; (3) the officers witnessed the two suspects leave Harley's home and head for the car; (4) the officers found the robbery victim's bank card in the console of the suspects' car; (5) all other known evidence of the armed robbery, such as the lottery tickets, the "black and gold handgun[,]" the victim's black purse, and her "driver's license, house keys[,] and miscellaneous personal papers[,]" had yet to be found; (6) the scene of the armed robbery, the gas station, and Harley's home were all within one mile of each other; and (7) the events that prompted the officers to apply for the search warrant all occurred within a two-hour period, late on a Tuesday night.

In our judgment, the warrant application provided a substantial basis for a reasonable judge to conclude that, despite other possibilities, there was a fair probability

17

that evidence of the armed robbery would be found in Harley's home. The circuit court did not err in reaching the same conclusion.[5]

In his opening brief, Harley seems to spend most of his time arguing that the State could not show the existence of the type of exigent circumstances that might justify entering his house without a warrant. *See generally Missouri v. McNeely*, 569 U.S. 141, 149 (2013) (discussing the exigent circumstances exception to the warrant requirement).[6] Harley seems not to recognize that the presence or absence of exigent circumstances is immaterial to whether the court could uphold the search under the independent source doctrine. There were no exigent circumstances in *Kamara*, yet this Court still affirmed the denial of the motion to suppress in that case. *Kamara* instructs that if a warrant was supported by probable cause derived from information completely independent of anything that the officers learned because they remained in the house after Harley instructed them to leave, then the search was valid under the independent source doctrine. *See Kamara v. State*, 205 Md. App. at 628-30.

In neither of his briefs does Harley cite, let alone discuss, *Kamara*. Nor does he explain why the independent source doctrine did not mandate the denial of his motion to

_____

[5] Harley conceded during the suppression hearing that "if the first warrant was valid, the following warrants were valid[.]" We agree with and accept this concession because the discovery of marijuana and a ghost gun during the first, warranted search undoubtedly provided probable cause for the issuance of the second search warrant.

[6] Of course, although the officers did not have a warrant when they entered Harley's house, they did not enter illegally. They entered with his consent. They remained illegally, after he instructed them to leave.

18

suppress.  Instead, Harley argues, at some length, that the State was required to prove that it would have inevitably discovered the contraband.

Harley misapprehends the difference between the independent source doctrine and the inevitable discovery doctrine: the independent source doctrine applies when evidence has been discovered by lawful means notwithstanding some unlawful conduct by the police, while the inevitable discovery doctrine applies when the evidence was not discovered by lawful means, but inevitably would have been.  *See Williams v. State*, 372 Md. at 410.  Here, we assume that the police violated Harley's Fourth Amendment rights by remaining in his house after he ordered them to leave and by detaining him while they awaited the warrant.  The officers, however, did not discover the contraband through those or any other unlawful means.  Rather, they discovered the contraband through lawful means—by means of a warrant that was based on probable cause derived from information completely independent from anything the officers learned during their stay in Harley's house.  In short, because the officers discovered the contraband through lawful rather than unlawful means, Harley is incorrect in asserting that the State was required to prove inevitable discovery.

In sum, although the officers' refusal to leave Harley's home and his detention therein may have been improper, the drugs, guns, and 3D printer were seized pursuant to valid warrants.  *Kamara v. State*, 205 Md. App. at 631.  "The [initial] warrant was independent of any observations made [during the detention] because: (1) the police made the decision to seek a search warrant prior to that time; and (2) the application for a warrant [made no] reference to [any] observations obtained during the [entry and

19

impoundment], [and] contained sufficient probable cause to issue the warrant." *Id.* "Accordingly, the evidence seized was admissible pursuant to the independent source doctrine, and the [circuit] court correctly declined to suppress the evidence seized pursuant to the search warrant[s]." *Id.*[7]

## II. Evidence at the Suppression Hearing

At the hearing on his motion to suppress, Harley asked to present the testimony of two police officers or the footage from an officer's body-worn camera. He claims that this evidence would have shown that the discovery of the contraband was not inevitable. The circuit court declined to entertain the evidence. Harley challenges that ruling on appeal.

In the circuit court, Harley proffered that his evidence would show "the actual sequence" of events, from when the officers examined the Sonata, through when they entered his residence, and thereafter. According to the proffer, the evidence would show what the officers told Harley about why he was being detained.

The court understood Harley to be proffering that the initial warrantless entry into his home and his detention were illegal. The court expressly assumed that all of Harley's proffered assertions were true. Having done so, the court declined to consider Harley's evidence because the evidence would only duplicate the proffer. The court expressly

---

[7] As an alternate ground for affirmance, the State invokes the good faith exception to the exclusionary rule (*see generally United States v. Leon*, 468 U.S. 897 (1984)), to argue that the officers proceeded in good faith reliance on a facially valid warrant and, thus, that a court should not suppress the evidence that they seized. Because we conclude that the warrants were supported by probable cause unrelated to any violation of Harley's rights, we need not consider that alternate ground for affirmance.

stated, however, that it would not preclude Harley from introducing any evidence pertinent to the applicability of the independent source doctrine.

Harley characterizes the court's decision to assume that his detention was unlawful based on factual representations rather than admitted evidence as a "procedural shortcut." He is incorrect.

The Maryland Rules of Evidence do not apply to suppression hearings. *Matoumba v. State*, 390 Md. 544, 550 (2006); *see* Md. Rule 5-101(b)(14). "In addition, under Rule 5-101(c)(1), the trial court has broad discretion, in the interests of justice, to decline to apply the Rules of Evidence in '[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 5-104(a).'" *Matoumba v. State*, 390 Md. at 552. "Because suppression hearings involve the determination of preliminary questions concerning the admissibility of evidence, . . . Rule 5-101(c)(1) grants the court broad discretion to decline to strictly apply the Rules of Evidence." *Id.*; *accord In re Ashley E.*, 387 Md. 260, 279-80 (2005) (stating that under Rule 5-101(c)(1) "the application of the various rules of evidence in a proceeding listed in subsection (c) is entrusted to the discretion of the court").

"Such evidentiary rulings will not be disturbed on appeal absent a clear abuse of discretion which materially prejudices the defendant." *Matoumba v. State*, 390 Md. at 552. "A trial court abuses its discretion" under Rule 5-101(c) "when it acts without reference to any guiding principles or rules of law[,] or where no reasonable person would take the view adopted by the trial court." *Id.* The circuit court did not abuse its discretion in this case.

A court may accept a proffer in determining whether evidence is admissible. *Holmes v. State*, 236 Md. App. 636, 662 (2018). Here, the court accepted Harley's proffer, and the State did not challenge it. Consequently, the court did not need any additional evidence on the subject—the evidence would have been cumulative, at best. Md. Rule 5-403. As the State observes, "The point of questioning witnesses or introducing video evidence would have been to establish facts which the court already accepted as true."

Harley argues that, had the court allowed him to present his evidence, he would have established where the officers found the marijuana. Harley proffered, however, that the officers had found the marijuana in a trash can in a hallway. The court did not need to hear evidence that was covered by Harley's unchallenged proffer.

Harley also argues that his evidence might have shown whether the destruction of the contraband was imminent, whether anyone had the opportunity to destroy the contraband, why the officers allowed Harley's wife to leave but required him to stay, the manner in which Harley was detained, and protests against his detention. These questions all pertain to the illegality of the detention—a fact that the court had resolved in Harley's favor when it accepted his proffer. Again, the court did not need to hear evidence that tended to prove what the court had already accepted as true.

Finally, Harley argues that his evidence related to "a host of other topics touching upon the applicability of the inevitable discovery doctrine." In making this argument, Harley still seems not to understand that the State, which had the burden of proving the applicability of an exception to the exclusionary rule, did not rely on the inevitable

22

discovery doctrine.  The court had no obligation to entertain evidence designed to refute an argument that the State did not make.

The court's decision to deny Harley the opportunity to present the officer's testimony and the body-worn camera footage was, therefore, not an abuse of discretion, nor was it a decision that materially prejudiced Harley at the suppression hearing.

**JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**